## 1629

WEISZ GRAPHICS DIVISION OF the FRED B. JOHNSON COMPANY, INC., Respondent v. PECK INDUSTRIES, INC., Appellant.

(403 S.E. (2d) 146)

Court of Appeals

*Desa A. Ballard* of *Ness, Motley, Loadholt, Richardson & Poole,* Barnwell, *for appellant.*

*J. Gregory Studemeyer* of *Cooper, Coffas, Heizer, Studemeyer & Megna,* Columbia, *for respondent.*

Heard Nov. 12, 1990.

Decided March 11, 1991.

BELL, Judge:

This is a seller's action for the price of goods sold. Weisz Graphics, the seller, sued Peck Industries, Inc., the buyer, on a contract for sale of specially manufactured goods. The circuit court found that Peck owed a balance of $80,935.97 plus interest and entered judgment for that amount. Peck appeals. We affirm.

Weisz is a custom manufacturer and seller of decals, markings, and other graphic materials. It competes in a national market. Its products include letters, numbers, stripes, logos, and decorative, safety and instructional labels and decals made of pressure sensitive vinyl. Weisz manufactures its

products to customer specifications based on blueprints, samples, art, or mechanical drawings. It manufactures to order and does not maintain a general inventory. However, it regularly engages in release programs with its customers.

Release programs are common in the industry. Under a release program, Weisz manufactures a large quantity of goods to customer order, then warehouses it for the customer. As the customer needs the goods, Weisz releases them in specified lots which are billed when shipped. Since release contracts involve large quantities of goods, the customer receives the benefits of economies of scale in terms of price and availability. He is also protected from price increases during the term of the contract. The cost of warehousing under a release program is built into the price quoted to the customer before the goods are manufactured.

Release programs in the industry are generally limited to one year. The time limitation is due in part to the shelf life of the goods. Weisz calculates shelf life based on the two year manufacturer's warranty it receives from the 3M Company, its vinyl supplier.

Weisz markets its products through a combination of company salesmen and independent manufacturer's representatives. Generally, the purchasing departments of Weisz's customers orally contact a salesman or representative to discuss a proposed order. The agent conveys the proposed order to Weisz's customer service department, which quotes a price to the agent. The agent then gives the quote to the customer's purchasing department. If the quote is satisfactory, the customer's purchasing department issues a written purchase order which the agent forwards to Weisz.

When Weisz receives the purchase order, it prepares a handwritten production order and forwards it to an order entry clerk. The clerk prepares two documents: (1) a typed Production Order which authorizes the manufacturing department to begin production; and (2) an Acknowledgment of Order which is prepared in triplicate. The original Acknowledgment is mailed to the customer. One copy is forwarded to the agent who procured the order. One copy is retained in Weisz's job jacket for that order. Thereafter, the goods are manufactured and shipped according to the contract.

Peck, a Tennessee corporation with operations in Memphis,

manufactures commercial signs for national and local accounts. It uses pressure sensitive vinyl letters, numbers, and other products purchased from manufacturers such as Weisz.

From time to time, beginning in 1985, Peck purchased part of its requirements from Weisz. Some contracts were for immediate manufacture and delivery. Other contracts were for extended delivery under a release program. Some contracts were negotiated directly between Peck and Weisz. Others were negotiated between Peck and the Decker Company, a manufacturer's representative in Memphis acting on behalf of Weisz. In this case, Peck dealt with Weisz through Decker.

This suit concerns three orders by Peck. After discussing the matter by phone with Decker and receiving a price quotation, Peck placed the largest of these orders, Purchase Order 5885, with Decker on April 7, 1986. Peck used its standardized order form. In addition to specifying the quantities, items, and prices of the goods, the form indicated the goods were to be in increments of 500 per letter or character, "TO BE BILLED AND SHIPPED AS RELEASED."

On April 8, 1986, Decker sent and Weisz received Purchase Order 5885. The next day, Weisz's order entry clerk prepared a Production Order. At the same time, the clerk also prepared a standardized Acknowledgment of Order, confirming the sale. On the acknowledgment form, in the blank for shipment terms, the clerk typed the words, "On Releases over 12 months." Peck received the Acknowledgment on April 14, 1986. It did not notify Weisz of any objection to a twelve month release program.

Pursuant to the Production Order, Weisz's production department finished manufacturing the entire order of more than 210,000 vinyl letters and numbers in early June, 1986. Over the next twelve months Weisz released and billed seven shipments at Peck's request. At the end of the twelve months, Weisz refused to make further shipments until Peck paid in full the remaining balance on the order. Peck refused to pay, choosing instead to obtain its requirements from other manufacturers at higher prices.

The facts regarding Peck's other two orders, Purchase Order 4037 and Purchase Order 4426, are similar. Peck placed Order 4037 for striping for Federal Express (a customer of Peck) on October 11, 1985. The order form stated on its face:

"ORDER AS NEEDED FOR A PERIOD OF 1 YEAR, 500 SHIP CHARGE RELEASE." Although Purchase Order 4037 specified a release period which expired in October, 1986, Peck has not requested release of all the goods manufactured pursuant to that order.

Order 4426 for ZAP Mail satin meld decals was placed on November 21, 1985. Among other things, it contained a term stating: "BREAK UP INTO MULTIPLE SHIPMENTS." Weisz's Acknowledgment of Order, dated November 23, 1985, contained the following shipment term: "On Releases Bill & Ship on release for 12 months." Peck did not object to this term. Some of the goods were billed and shipped on release within the twelve months. Weisz still has some for which Peck has never requested release.

## I.

Weisz sued Peck under Section 2-709(1) of the Uniform Commercial Code (Section 36-2-709(1), Code of Laws of South Carolina, 1976, as amended). That section provides, in pertinent part:

> When the buyer fails to pay the price as it becomes due the seller may recover . . . the price . . . of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances indicate that such effort will be unavailing.

> Goods not in existence when the contract is made are identified to the contract when designated by the seller as goods to which the contract refers. Section 2-501(1)(b). In the case of goods manufactured to order, identification to the contract usually occurs when the first step of production begins. *See Little v. Grizzly Manufacturing Co.*, 195 Mont. 419, 636 P. (2d) 839, 32 UCC Rep. 1087 (1981); *cf. Massillion Sign & Poster Co. v. Buffalo Lick Springs Co.*, 81 S.C. 114, 61 S.E. 1098 (1908). It is not necessary for the goods to be in a deliverable state for them to be identified to the contract. *Holstein v. Greenwich Yacht Sales, Inc.*, 122 R.I. 211, 404 A. (2d) 842, 27 UCC Rep. 397 (1979).

In this case, the goods for all three orders were identified to the contract. By agreement of the parties, the price became due thirty days after Weisz delivered the goods to Peck's

place of business. This much is not disputed. The parties differ on the agreed time for delivery.

Weisz claims the contracts for all three orders specified delivery within a twelve month release period. Peck contends the parties did not agree to a twelve month release. Instead, Peck argues, because there was no agreement, delivery should be within a reasonable time. *See* Section 2-309 (time of delivery, if not agreed upon, shall be a reasonable time). Based on its need for the decals, Peck estimated a reasonable time to be about three years.

This dispute about the delivery term results from what is commonly known as the "battle of the forms."

At common law, no contract is formed if the acceptance varies the terms of the offer. *See Sossamon v. Littlejohn,* 241 S.C. 478, 129 S.E. (2d) 124 (1963). Instead, an acceptance which adds different or additional terms is treated as a counteroffer, which may be accepted or rejected by the other party. *Id.;* Restatement (Second) of Contracts § 59 (1979). This so-called "mirror-image" rule, is well suited to simple, one time transactions, in which the parties contract face to face. However, it fails to accommodate the realities of much modern commercial practice.

The rise of mass produced goods, the growth of markets, and the advance of communications technology have brought changes from former methods of making commercial contracts. Many such contracts are no longer concluded on a face to face basis nor are they individually drafted. As in the case at bar, the parties often exchange preprinted, standardized forms to finalize their bargain. These forms use stereotyped provisions (called "boilerplate") tailored to the practices of the specific business, trade, or industry. They also contain blank spaces where the parties may insert the negotiated terms (*e.g.,* description of the goods, quantity, price) upon which they have agreed in their particular bargain. Many times, the standard forms omit material terms of the contract which are mutually understood by the parties based on past dealings or common customs and usages in their type of business. Seldom are the provisions in the seller's form identical to those in the buyer's form. In other words, the forms are not "mirror images." Nevertheless, the parties consider them to be the basis of the contract. To apply the "mirror image" rule in such cir-

cumstances would defeat their intention to be mutually bound to the basic bargain.

For this reason, the Uniform Commercial Code modifies the "mirror image" rule. Two approaches under the Code are of particular relevance to this case.

First, Section 1-205(3) states:

> A course of dealing between parties and any usage of trade in the . . . trade in which they are engaged or should be aware [sic] give particular meaning to and supplement or qualify terms of the agreement.

*See also Burden v. Woodside Cotton Mills,* 104 S.C. 435, 89 S.E. 474 (1916) (usages of a trade or business are presumed to form part of contract unless excluded by agreement). Similarly, Section 2-208(1) provides that a course of performance between the parties which is accepted or acquiesced in without objection by a party with opportunity to object is relevant to determine the meaning of the agreement. *Cf. Carter v. American Fruit Growers, Inc.,* 130 S.C. 280, 125 S.E. 641 (1924).

Second, the Code provides that an expression of assent to the bargain operates as an acceptance, not a counteroffer, even though it contains different or additional terms.[1] Thus, when the buyer sends its offer by its standardized purchase order and the seller accepts by its standardized acknowledgment form, the contract is made.

Even so, the problem of the different or additional terms remains. To resolve that problem, Section 2-207(2) provides:

> The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> (a) the offer expressly limits acceptance to the terms of the offer;
>
> (b) they materially alter it; or
>
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

---

[1] Section 2-207(1) provides in pertinent part: "A . . . written confirmation . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

Turning to the facts of this case, we hold that the contracts between Peck and Weisz were for delivery on twelve month release.

### A.

As to Purchase Order 4037, Peck itself specified that delivery was on release for one year. There is no evidence that Weisz's Acknowledgment contained a similar notation. However, Weisz did not object and began delivering the goods on release.

Purchase Order 4426 specified multiple shipments, but no release period. Weisz's uncontradicted evidence showed that a time limitation of twelve months on release programs is standard in the industry. It also showed that its prior course of dealing with Peck had been to ship on twelve month release. None of its release contracts with Peck exceeded twelve months. Moreover, Peck accepted performance of Order 4426 without objection. Therefore, under Sections 1-205(3) and -208(1) the twelve month release period supplemented the express provisions of the written form and was part of the contract.

The same is true of Purchase Order 5885. Like Purchase Order 4426, it specified no release period. However, its express provisions were supplemented by trade usage and prior course of dealing which established the twelve month release period as a term of the contract.

### B.

In the alternative, the twelve month release period became a term of the contract under Section 2-207(2). In response to Purchase Order 4426 and 5885, Weisz's acknowledgment forms added a twelve month release provision. Neither of Peck's orders expressly limited Weisz's acceptance to the express terms of its standard form. Nor did Peck give Weisz a notification of objection to the twelve month limit within a reasonable time after receiving the acknowledgments. Instead, Peck began accepting performance of the contract without objection. Finally, the twelve month limit was not a material alteration of the contract. Because it conformed to existing trade usage and prior course of dealing between the parties, it did not result in unreasonable surprise or hardship to Peck. *See* Section 2-207, Official Comments 4 and 5

(clause within range of trade usage does not constitute a material alteration). Accordingly, both contracts incorporated a term for delivery on twelve month release. Payment in full of the balance on the purchase prices was due at the end of the twelfth month.[2]

## II.

Peck argues that if payment was due on a twelve month release, Weisz cannot recover the price because it did not attempt to resell the goods. As noted above, Section 2-709(1)(b) requires the seller to make a reasonable effort to resell the goods, unless the circumstances indicate that such an effort will be unavailing.

The evidence showed that Weisz custom manufactured the goods in question to Peck's specifications. For the numbers and letters, Peck chose the type style used, Franklin Gothic Extra Condensed, per sample. Weisz had to order special dies to cut the characters in this style. These dies were used to produce goods for Peck only and for no other customer. The

---

[2] Peck excepts to the admission of testimony by Weisz's customer service manager, Kilpatrick, concerning the breakdown of letters and numbers to be produced and the typeface to be used for Purchase Order 5885. Peck claims there is no competent evidence that these matters were agreed to in the oral discussions with Decker that preceded the Purchase Order. This point is irrelevant. The flaw of Peck's entire argument is the assumption that Weisz had to prove the exact contents of the oral discussions between Decker and Peck to prove the contract. The written forms, not prior oral negotiations, constituted the basis of the contract. *See* Section 2-207(1) (written confirmation operates as an acceptance even though it states terms additional to or different from those offered or agreed upon). The forms show on their face that the contract was not wholly integrated, since they contain nothing about release dates, specific letters and numbers, typeface, and similar matters. It is clear from the record, however, that these "missing" terms were a part of the contract supplied by prior course of dealing and confirmed by Weisz's course of performance to which Peck did not object. *See* Section 2-202 (terms of confirmatory memoranda may not be contradicted by evidence of prior or contemporaneous oral agreement, but may be supplemented by course of dealing or usage of trade); *see also* Section 2-208(1) (course of performance accepted without objection relevant to determine meaning of contract). For example, the Production Order stated that the breakdown of characters and the type style were to be "As Prev. Prod." Peck has not claimed Weisz did not produce the correct goods in the correct quantities. It has never objected that the goods delivered or those still held by Weisz (which it inspected for itself) do not conform to the contract. Indeed, its vice president for operations testified Peck was still willing to purchase the retained goods over a longer time. In these circumstances, the error, if any, in admitting Kilpatrick's testimony was harmless, and Peck's exception is without merit.

striping and the satin meld decals were also custom made for specific customers of Peck.

There was testimony from Weisz's corporate sales manager and its chief financial officer that the goods could not be marketed to another buyer. Weisz had no customer except Peck to purchase them. No other market for them existed. They were not marketable in any commercially reasonable manner. Peck's vice president for sales himself testified that Weisz was in the best position to determine the marketability of the goods. He was unaware of anyone who would be willing to buy $80,000 worth of Franklin Gothic Extra Condensed letters and numbers. Weisz still possessed the goods and they were available for delivery as soon as Peck paid for them.

This evidence amply supported the circuit court's finding that any effort by Weisz to resell the goods would be unavailing. *Cf.*, *FMI, Inc. v. RMAX, Inc.*, 286 S.C. 343, 333 S.E. (2d) 360 (Ct. App. 1985). In an action at law, the reviewing court must uphold the findings of fact of the trial judge if there is any evidence to support them. *See Mace Industries v. Paddock Poll Equipment Co.*, 288 S.C. 65, 339 S.E. (2d) 527 (Ct. App. 1986).

For the reasons stated, the judgment is

Affirmed.

SHAW and CURETON, JJ., concur.

