A01A0048. CALHOUN v. CULLUM'S LUMBER MILL, INC. et al.
(545 SE2d 41)

ELDRIDGE, Judge.

Plaintiff-appellant John R. Calhoun filed suit, claiming tortious interference with contract against defendant-appellees Cullum's Lumber Mill, Inc. and its owner Mickey Scott (collectively "Cullum's Mill"); Commercial Real Estate Properties, Inc. ("CRP"); and Yeomans' Wood & Timber, Inc. ("Yeomans' Wood"). The State Court of Chatham County granted the defendants' motion for summary judgment. For the reasons that follow, we affirm.

The instant case arose from Calhoun's attempts to finance the purchase of Delta Plantation, a 5,000-acre tract of land in Jasper County, South Carolina. On November 7, 1995, Calhoun entered into a contract to purchase Delta Plantation. With regard to the negotiations and sale of Delta Plantation, the seller was represented at all times by CRP, and CRP signed the contract on the seller's behalf. The contract specified that closing on the sale was to be December 15, 1995. Thereafter, the time was extended in writing to December 22, 1995.

Prior to closing, Calhoun attempted to obtain financing for the $9.75 million sale price. In order to facilitate such, Calhoun bid the timber on Delta Plantation to several timber companies, including Cullum's Mill, which entered a bid proposal of $4.25 million for the timber. Yeomans' Wood, another timber company, faxed to Calhoun a bid proposal of $4.35 million to harvest the timber. There is no written acceptance of any bid proposal in the record. However, by deposition, Calhoun testified that the written and signed bid proposal from Yeomans' Wood was orally accepted via telephone on December 21, 1995.

The record shows that, following the acceptance of the Yeomans' Wood bid price, Calhoun and Yeomans' Wood continued to negotiate the terms of the timber purchase agreement, which included special,

environmentally sensitive conditions Calhoun wanted in the timber contract which limited the amount of timber that could be harvested from specific areas of the Plantation, as well as the manner in which the timber could be harvested. In subsequent communications regarding his required terms, Calhoun made clear that the sale of the timber would be "subject to clear title and an agreeable timber sales contract. We would request that we have acceptance or refusal [of the additional terms] within 24 hours." Thereafter, the parties did not sign a timber lease/contract.

The record further shows that Calhoun could not obtain sufficient financing for the entire purchase price of Delta Plantation by either the contract closing date of December 15 or the extended date of December 22, 1995. On December 27, 1995, Calhoun faxed the seller a letter stating,

> It appears that we will be unsuccessful in fulfilling our contract dated November 7, 1995. However, I would like to make the following offer for your consideration. The offer will be $6,850,000 cash at closing, plus a personal note in the amount of $2,900,000 for four years at City Bank Prime interest.

The letter had a line for the seller's signature with the notation "accepted," and Calhoun requested that the seller fax such acceptance to CRP with the understanding that closing would then take place on December 29, 1995. No written acceptance of Calhoun's counteroffer is in the record, nor was the contract amended to reflect any additional terms. On December 29, 1995, Yeomans' Wood withdrew its bid proposal for the timber on Delta Plantation.

On January 23, 1996, Calhoun, through a representative, sent CRP a letter expressing disappointment that the deal had not been closed:

> With the rejection of my partner John Calhoun's latest proposal to purchase part of Delta Plantation, it appears that this deal has fallen through much to John's dismay. . . . [P]lease express John's great appreciation to Mr. Paulson [seller] for his cooperation and flexibility in attempting to work out a deal that could be consummated. Please keep us in mind if Mr. Paulson decides at some point in the future that he would be willing to split up the house and left side of the plantation from the rest of the property.

In this letter, Calhoun also sought return of the $200,000 earnest money he had put down in contemplation of sale. However, CRP would not return the earnest money, which had been released to the

seller pursuant to a December 15, 1995 letter from Calhoun.[1]

On February 3, 1996, Cullum's Mill entered into a contract for the purchase of Delta Plantation for $8.625 million. CRP, as broker for the seller, made less commission from the sale of the property to Cullum's Mill than it would have, had the sale to Calhoun been completed.

On April 3, 1996, Calhoun filed an action in the State Court of Chatham County, I96-0614F, against Delta Plantation Corporation, CRP, Richard Smith, and Yeomans' Wood; he sought the return of the $200,000 in earnest money and money damages, as well as litigation costs and attorney fees. In his complaint, Calhoun alleged breach of the sales contract with Delta Plantation; breach of a timber contract with Yeomans' Wood; breach of contractual obligations owed to Calhoun on the part of CRP and Smith; breach of fiduciary duties owed to Calhoun by CRP and Smith; and tortious interference with the Delta Plantation sales contract by CRP and "others."

On December 22, 1997, Calhoun filed the instant action in the State Court of Chatham County, I97-3028G, against Cullum's Mill, CRP, and Yeomans' Wood and its owner, Scott.[2] In this second suit, Calhoun's sole claim was one for tortious interference with the Delta Plantation sales contract by all named defendants; he sought $5 million in money damages, as well as litigation costs and attorney fees. Calhoun later amended the instant complaint to add a claim of breach of contract against Yeomans' Wood and then voluntarily dismissed his first law suit, I96-0614F.

Pursuant to motion for summary judgment, the trial court granted same as to all defendants. Calhoun appeals from the grant of summary judgment. *Held:*

1. We recognize the validity of defendants' claims regarding the prior suit doctrine codified in OCGA §§ 9-2-5 and 9-2-44.[3] However, as most probably recognized by the trial court in choosing to address the merits of the summary judgment motions, dismissal without prejudice of the instant action under OCGA § 9-2-5 would most likely serve as a postponement, as opposed to a conclusion, to a case that

---

[1] The December 15, 1995 letter stated: "This is my permission to Dick Smith at [CRP] to send $100,000 from my escrow account to Mr. Allan Paulsen [sic] today. I am enclosing a second check to Mr. Smith for $100,000 making a total credit against the sale in my binder account of $200,000."

[2] A fifth defendant, Union Camp Corporation, was voluntarily dismissed from the action.

[3] No plaintiff may prosecute two actions in the courts at the same time for the same cause of action and against the same party. If two such actions are commenced simultaneously, the defendant may require the plaintiff to elect which he will prosecute. If two such actions are commenced at different times, the pendency of the former shall be a good defense to the latter.
OCGA § 9-2-5 (a).

has lingered long enough. Finding wisdom in the trial court's approach, we too will address the merits of the instant appellate issues.

2. Calhoun claims that, by withdrawing its timber bid proposal, Yeomans' Wood breached a timber contract that was formed when Calhoun orally accepted Yeomans' written and signed bid. In that regard, Calhoun argues that South Carolina law controls the instant issue, since any timber contract was to be performed in that state.

> Under the rule of lex loci contractus, the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply.[4]

Although the bid proposal and acceptance occurred in Georgia, the harvesting of the timber was to be performed in South Carolina. Accordingly, we will apply the laws thereof to determine the validity of any alleged contract.

Under specific statutory provisions, South Carolina views "timber to be cut," not as an interest in the land, but as "goods" which are governed by the provisions of its Commercial Code.[5] As such, and unlike Georgia law where the Statute of Frauds becomes a factor, an oral acceptance of a written timber bid which has been signed by the offeror can serve to bind the parties.[6] With regard to an acceptance which, as in the instant case, contains additional terms, the South Carolina Commercial Code states in pertinent part that

> a definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.[7]

---

[4] (Citations and punctuation omitted.) *Lloyd v. Prudential Securities*, 211 Ga. App. 247, 248 (438 SE2d 703) (1993).

[5] See S.C. Code § 36-2-107 (2).

[6] See S.C. Code § 36-2-206 (an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances). See also S.C. Code §§ 36-2-204 (a contract for sale of goods may be made in any manner sufficient to show agreement); 36-2-201 (contract for sale of goods over $500 is enforceable if there is some writing sufficient to indicate that a contract for sale has been made and signed by the party against whom enforcement is sought or by his authorized agent or broker).

[7] S.C. Code § 36-2-207.

The adoption of S.C. Code § 36-2-207 resulted from what is commonly known as the "battle of the forms" between merchants; therein, parties exchange preprinted, standardized forms to finalize their bargain, which forms tend to use "boilerplate language" and omit material terms.[8]

> However, there are some situations which simply do not warrant application of § 2-207. It has been noted by Professors White and Summers that in the case of non-form agreements, there is no pattern of exchange of printed forms. Under such circumstances, when the parties fully negotiate each provision of a contract, a contract may be "beyond the reach of 2-207 and adrift on the murky sea of common law." White and Summers, [Uniform Commercial Code] § 1-3 at p. 29 [(4th ed. 1995)]. See also Brown, [Restoring Peace in the Battle of the Forms: A Framework for Making Uniform Commercial Code Section 2-207 Work, 69 N.C. L. Rev. 893] at p. 943 (concluding section 2-207 is inapplicable if no form is used or if the disputed term was the subject of precontract negotiation). We find the present case presents such a situation. The parties met and negotiated the provisions of their contract, through their attorneys, for several [weeks]. They exchanged . . . draft proposals, making numerous changes. . . . Under the limited factual circumstances presented here, we find this is simply not a "battle of the forms" case, on the contrary, this was merely one more in a series of contract negotiations. Accordingly, we find section 2-207 inapplicable to the present facts.[9]

Thus, "adrift on the murky sea," we apply common law principles in the instant case for the purpose of determining whether, as a matter of law, a contract was formed by Calhoun's acceptance of Yeomans' timber bid proposal. And in doing so, we return again to familiar ground, because in the application of the common law, "it must be the common law as interpreted by the courts of Georgia and not of [South Carolina]."[10]

At common law, a purported acceptance containing terms which did not "mirror" those of the offer operates as a rejection thereof and

---

[8] *Weisz Graphics v. Peck Indus.*, 304 S.C. 101, 108-109 (403 SE2d 146) (1991).
[9] *Hyundai v. Hyundai*, 326 S.C. 78, 82 (484 SE2d 468) (1997).
[10] *Leavell v. Bank of Commerce*, 169 Ga. App. 626 (2) (314 SE2d 678) (1984). See also *Slaton v. Hall*, 168 Ga. 710 (148 SE 741) (1929); *Aetna Life Ins. Co. v. Evans*, 56 Ga. App. 336 (192 SE 483) (1937); *Raintree Trucking Co. v. First American Ins. Co.*, 245 Ga. App. 305 (534 SE2d 459) (2000).

amounts to a counteroffer.[11] Under such standard, as a matter of law, no timber contract was formed in this case. Calhoun's written addition of terms and restrictions on the harvesting of the timber rejected Yeomans' bid offer and acted as a counteroffer specifically conditioned on Yeomans' acceptance of the terms and restrictions. Calhoun's December 27, 1995 fax to Yeomans' Wood expressly asked for "acceptance or refusal [of the additional terms and restrictions] within 24 hours."

In fact, Calhoun's counteroffer materially altered the Yeomans' Wood bid proposal, which was for the harvesting of "*all* merchantable timber less and except unmerchantable live oak trees, magnolia trees and cypress trees in extreme wet areas." (Emphasis supplied.) Calhoun's counteroffer prohibited the harvesting of *any* live oak, magnolia, or wet area cypress, as well as required: a 100-foot buffer of hardwoods along the frontage of US 17, SC 170, and SC 92; a 100-foot buffer of hardwoods along the main drive to the house and all mowed areas; and a minimum 50 acres of wildlife reserve areas to be left scattered across the tracts in which all hardwoods were to be left unharvested. Accordingly, Calhoun's counteroffer reduced the quantity of timber to be harvested for the total bid price originally offered by Yeomans' Wood. The record shows that Yeomans' Wood never accepted Calhoun's counteroffer.

Further, while the record contains an unsigned timber sale agreement which includes the added terms and restrictions proposed by Calhoun, we reject Calhoun's contention that such constitutes an acceptance of those terms on the part of Yeomans' Wood simply because the unsigned agreement was prepared by Yeomans' attorney. The attorney testified that the agreement was prepared for review only, and "[t]hese restrictions that were in the timber sale agreement came from Mr. Calhoun's office. These were put in this agreement preliminarily . . . but Yeomans never approved of this." There is no evidence of record to the contrary.

> [A]n attempted acceptance which seeks to modify one or more terms of the offer is of no legal effect as an acceptance. It is really a rejection of the offer, and a counter-proposition in lieu of the original offer, and must be accepted by the party making the original offer, in order to constitute an agreement.[12]

---

[11] OCGA § 13-3-2; *Lamb v. Decatur Fed. Sav. &c. Assn.*, 201 Ga. App. 583, 585 (411 SE2d 527) (1991). See also *Sossamon v. Littlejohn*, 241 S.C. 478 (129 SE2d 124) (1963).

[12] (Citations and punctuation omitted.) *Lamb v. Decatur Fed. Sav. &c.*, supra at 585; see also *Amwest Surety Ins. Co. v. RA-LIN & Assoc.*, 216 Ga. App. 526, 529 (1) (455 SE2d 106) (1995).

Here, we conclude as a matter of law that Calhoun's attempt to materially alter and restrict the terms of the Yeomans' Wood timber bid acted as a counteroffer thereto. The record shows that such counteroffer was never accepted. As a consequence, the trial court did not err in granting summary judgment on Calhoun's breach of contract claim against Yeomans' Wood.

3. We also find no error in the trial court's grant of summary judgment to CRP on Calhoun's claim of tortious interference with the contract for sale of Delta Plantation. "[I]t is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered."[13] One must be a stranger "to both the contract *and* the business relationship giving rise to and underpinning the contract."[14] In this case, we do not find that CRP, which was authorized to independently negotiate on the seller's behalf, apprised the seller of the status of such negotiations, advised the seller on actions with regard to such negotiations, and signed the contract in the seller's stead, was a "stranger" to the contract of sale and/or the business relations underpinning such sale. Thus, as a matter of law, a claim against CRP for tortious interference with the contract of sale for Delta Plantation cannot be sustained.

4. Likewise, we find no error in the trial court's grant of summary judgment to Cullum's Mill and Yeomans' Wood on Calhoun's claim of tortious interference with contract.

As it relates to this case, an action for tortious interference with contract requires malicious and improper action by the defendants for the purpose of inducing a breach of contractual obligations.[15] In that regard, the essence of Calhoun's argument appears to be that Cullum's Mill and Yeomans' Wood improperly and maliciously conspired together to cause a breach of Calhoun's contract to purchase Delta Plantation; in furtherance of this conspiracy, Yeomans' Wood allegedly withdrew its timber bid solely to frustrate Calhoun's financial ability to purchase the Plantation, thereby leaving the property open for purchase by Cullum's Mill.

However, reviewing the record carefully and recognizing that all inferences are to be drawn in favor of Calhoun, the nonmovant,[16] the record contains no nexus whatsoever between Cullum's Mill and the

---

[13] *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 608 (2) (503 SE2d 278) (1998).

[14] (Emphasis in original.) Id. at 609.

[15] See *Renden, Inc. v. Liberty Real Estate &c.*, 213 Ga. App. 333, 334-335 (2) (444 SE2d 814) (1994).

[16] *Taylor v. Gelfand*, 233 Ga. App. 835, 836 (505 SE2d 222) (1998).

bid proposal put forth and subsequently withdrawn by Yeomans' Wood. Yeomans' Wood put forward evidence that the decision to withdraw its timber bid proposal was based on financing considerations, including certain terms and conditions placed on funds which were otherwise available. The evidence further shows that Yeomans' Wood did not benefit in any way from the sale of Delta Plantation or its timber to Cullum's Mill, which is its competitor in the timber market. Thus, no inference is raised that the withdrawal of the Yeomans' Wood timber bid was in any way connected to the ultimate sale of Delta Plantation to Cullum's Mill.

Also, we can find in the record absolutely no connection between Cullum's Mill and the failure of Calhoun's contract to purchase Delta Plantation. While Calhoun argues that Cullum's Mill became interested in the Plantation only after Calhoun hired its owner, Scott, to cruise the property's timber in anticipation of Calhoun's purchase, the record belies such argument. Cullum's Mill made an offer to purchase Delta Plantation in January 1995, ten months before Calhoun entered into the contract for the purchase of the property. At that time, the Cullum's Mill offer was rejected by the seller. The record shows that Cullum's Mill made its second offer only *after* Calhoun failed to close on his contract to purchase Delta Plantation.

On summary judgment, the burden on Cullum's Mill and Yeomans' Wood, as the moving parties, may be discharged by pointing out by reference to the affidavits, depositions, and other documents in the record that there is an absence of evidence to support an essential element of Calhoun's claim of tortious interference with contract.[17] Since malicious, improper collusion for the purpose of inducing a failure of the Delta Plantation purchase contract is an essential element of Calhoun's tort claim, the absence of this element in the record shifts the burden to Calhoun. He may no longer rest on his pleadings, but must point to specific evidence giving rise to a triable issue of fact on such element.[18] This he has failed to do. It is clear from Calhoun's deposition testimony that he is bitterly disappointed by his failure to purchase Delta Plantation, a location he identifies as "the most beautiful place I'd ever seen in my lifetime." It is also equally clear that Calhoun's suspicions about foul play in the failure of the purchase are just that, suspicions:

[Defense attorney:] Well, let me ask you this. Tell me your version of the conspiracy you've alleged in this lawsuit, who conspired with who to do what?
[Calhoun:] I think Mr. Scott [Cullum's Mill] got to somebody

---

[17] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).
[18] OCGA § 9-11-56 (e).

and got some way to buy this land and timber over there and I think he got to somebody, and who that somebody is, I don't know, and somebody had to get to Mr. Yeomans.

After full discovery on this issue over a span of three years, which included numerous documents, affidavits, and depositions of every possible "somebody" involved, it appears from the record that Calhoun's suspicions are as factually undefined as the day on which he first posited them. As a consequence, the award of summary judgment to Cullum's Mill and Yeomans' Wood on Calhoun's tortious interference with contract claim was proper.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur. Andrews, P. J., disqualified.*

DECIDED JANUARY 23, 2001 —
RECONSIDERATION DENIED FEBRUARY 7, 2001 — 

*Robert S. Kraeuter,* for appellant.
*Ellis, Painter, Ratterree & Bart, R. Clay Ratterree, Tracy A. O'Connell, Paul D. Meyer, Karsman, Brooks & Callaway, Edward M. Hughes, Timothy J. Haeussler, John E. Suthers, Christopher J. Thompson,* for appellees.

