DOYLE, Chief Judge.
This case arises out of the mislabeling of the remains of a stillborn baby, resulting in the funeral and burial of the wrong child. The trial court initially denied summary judgment to the defendant hospital after concluding that under the choice-of-law rule of lex loci delicti, Alabama law would govern the emotional distress claims brought by the plaintiff mother, who first learned of the mishandled remains when contacted at her home in Alabama. The trial court later revisited the issue, however, and concluded that application of Alabama law would violate Georgia public policy because Alabama does not impose an “impact rule” on plaintiffs seeking damages for emotional distress arising from the negligent mishandling of human remains. After concluding that Georgia law should apply, the trial court granted summary judgment in favor of the hospital, holding that the mother’s emotional distress claims failed as a matter of law because she could not show physical injury, pecuniary loss, or sufficiently outrageous misconduct by the hospital. For the reasons discussed below, we affirm.
*279 Summary judgment is proper only if the pleadings and evidence “show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.”[1] On appeal from a trial court’s grant of summary judgment, we “conduct a de novo review, construing all reasonable inferences in the light most favorable to the nonmoving party.”[2]
So viewed, the record shows that Amanda Rae Coon lives in Opelika, Alabama. On February 8, 2011, Coon, who was 37 weeks pregnant, went for a routine prenatal examination at her obstetrician-gynecologist’s office in Columbus, Georgia. During the examination, Coon learned that her unborn baby did not have a heartbeat.
The following day, Coon was admitted to a Columbus hospital owned by The Medical Center, Inc. (the “hospital”), where her labor was induced and she delivered a stillborn baby girl. After the delivery, the hospital’s bereavement coordinator spoke with Coon and her father, who informed the coordinator that the remains of the baby were to be released to a funeral home in Opelika. The bereavement coordinator completed a mortuary permit and supporting documents that included the pertinent funeral home information and placed these documents with Coon’s patient chart.
The stillborn baby initially remained with Coon in her hospital room, but Coon’s mother later informed the bereavement coordinator that Coon was tired and asked that the baby be removed. The coordinator placed Coon’s baby in a separate holding room on the same floor until someone could take the baby to the hospital morgue. In addition to Coon’s baby, there was a smaller stillborn baby boy, who was less than 20 weeks in gestation, already in the holding room.
When the bereavement coordinator placed Coon’s baby in the holding room with the smaller baby, the hospital floor was in the middle of the evening shift change. A nurse whose shift had just begun volunteered to transport both babies from the holding room to the morgue. Under a hospital policy put into effect two days earlier, identification tags were to be placed on the arm and leg of a stillborn baby and on the outside of the cadaver bag before being delivered to the morgue. The nurse filled out the three tags for both of the babies.
The nurse had not yet had an opportunity to affix the identification tags when a hospital security guard came to the floor and asked the nurse if she was ready for him to escort her to the morgue with the babies. Because the babies were not yet prepared for transport to the morgue, the security guard decided to assist the nurse with the *280 placement of the identification tags. The security guard had never tagged a deceased baby, and his job duties did not include tagging the remains of deceased patients or preparing them for transport to the morgue.
When the security guard began assisting the nurse, they mixed up the identification tags. The nurse tagged the smaller baby with the identification tags for Coon’s baby, and the security guard tagged Coon’s baby with the identification tags for the smaller baby. The security guard placed a tag on the outside of the cadaver bag for Coon’s baby, but chose not to “fool” with the tags on the baby’s body because he did not want to remove any of the baby’s clothing. The nurse repeatedly told the security guard that he needed to place identification tags on the body of Coon’s baby, but he chose not to do so.
The nurse and the security guard transported the stillborn babies to the morgue with the wrong identification tags and logged in the remains. Because of the incorrect identification tags, the hospital mistakenly released the wrong baby to the Opelika funeral home.
On February 12, 2011, Coon, her family members, and other mourners attended a funeral at an Opelika cemetery for a deceased stillborn baby whom they believed was Coon’s. Coon and her family members did not view the baby’s remains before or during the funeral service after the funeral director advised against it, given the condition of the remains.[3] The costs of transporting the baby from the hospital to the funeral home were paid by Coon’s husband through the military, and Coon’s aunts paid for the funeral service and donated the burial plot.
On February 23,2011, the hospital discovered that it had released the wrong baby to the Opelika funeral home. The hospital contacted the director of the Opelika funeral home, informed him of the mistake, and requested contact information for Coon’s family. The funeral director advised the hospital to contact Coon’s father rather than Coon herself because “mentally, she [would] just not [be] able to take it” if she learned of the mistaken identification.
Later that day, the hospital’s chief executive officer contacted Coon by telephone and informed her that the hospital had released the wrong baby for burial. The following day, the baby who had been mistakenly released to the funeral home was exhumed from the *281 Opelika cemetery. The funeral home director then traveled to Columbus to deliver the exhumed baby to a different funeral home and to retrieve Coon’s baby from the hospital.
After the exhumed baby’s remains were handed over to the representative of another funeral home, the Opelika funeral director retrieved a cadaver bag from the hospital morgue that had an identification tag for Coon’s baby on the outside of it. Yet, when the director returned to his funeral home in Opelika, he discovered that the cadaver bag contained nothing but a blanket, and he had to return again to the hospital morgue to obtain Coon’s baby, whom hospital employees had left in a holding room in the morgue. In violation of hospital policy, no documentation was made in the morgue log book showing when Coon’s baby or the exhumed baby were returned to the morgue or to show when the switch occurred and who was involved.
Once the funeral director obtained the proper remains from the hospital, Coon’s baby was buried at the Opelika cemetery. The hospital paid the costs associated with the exhumation of the misidentified baby and the subsequent burial of the correct remains. Coon did not attend the second burial because she “could not handle having to go through that all over again.”
In March 2011, Coon filed the present lawsuit against the hospital, seeking damages for the emotional distress she suffered as result of the mishandling of her stillborn child’s remains.[4] Following discovery, the hospital moved for summary judgment, contending that Coon’s emotional distress claims failed under Georgia law because Coon suffered no physical injury or pecuniary loss and the conduct of the hospital was not intentional, reckless, extreme, or outrageous. In response, Coon argued that Alabama law applied under the choice-of-law rule of lex loci delicti because she suffered the relevant emotional distress in Opelika, where she learned of the hospital’s mistake and the funeral service, burial, exhumation, and reburial had occurred. Coon further argued that under Alabama law, she was not required to prove physical injury, pecuniary loss, or intentional or reckless misconduct to support an emotional distress claim for the mishandling of human remains.
The trial court concluded that Alabama law applied and denied the hospital’s motion for summary judgment. When the hospital moved for reconsideration, the trial court denied the motion but certified its order for immediate review. The hospital then filed an *282 application for interlocutory appeal. This Court initially granted the application but later dismissed it as improvidently granted.
Following the dismissal of the appeal, the hospital filed a renewed motion for summary judgment, contending that Alabama law should not apply under the public policy exception to the lex loci delicti rule and that all of Coon’s claims failed under Georgia law. The trial court agreed with the hospital, concluding that the application of Alabama law would contravene Georgia public policy because Alabama, unlike Georgia, does not have an “impact rule” in emotional distress cases involving the negligent mishandling of human remains. Applying Georgia law rather than Alabama law, the trial court further concluded that Coon’s claims failed as a matter of law under the more stringent standard for emotional distress claims in Georgia. Consequently, the trial court granted the hospital’s renewed motion for summary judgment, resulting in this appeal by Coon.
1. Coon argues that the trial court erred by concluding that Georgia rather than Alabama law should apply in this case based on the public policy exception to the rule of lex loci delicti. We disagree.
Under Georgia law, choice-of-law issues in tort cases are controlled by the rule of lex loci delicti, which requires courts to apply the “substantive law of the place where the tort or wrong occurred.”[5]
The general rule is that the place of wrong, the locus delicti, is the place where the injury sustained was suffered rather than the place where the act was committed, or, as it is sometimes more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place.[6]
Here, pretermitting whether the last event necessary to make the hospital liable for the alleged tort took place in Alabama,[7] Georgia law applies to Coon’s claims against the hospital based on the public policy exception to the rule of lex loci delicti.[8] As aptly stated by the *283 trial court, “there is a significant difference between Alabama and Georgia law on the issue of the impact rule. Georgia follows its impact rule for sound reasons. It is not proper to ignore the rule of law regardless of the compelling emotional considerations.” The policies behind Georgia’s impact rule have been fully developed, and our Supreme Court has rejected invitations to abandon the impact rule in difficult cases.[9] Accordingly, the trial court properly applied Georgia law to this case in granting summary judgment to the hospital.[10]
2. Coon also argues that, under Georgia law, the trial court erred by ruling that she did not suffer pecuniary loss as alleged in her First Amended Complaint.[11] Under Georgia’s impact rule, “recovery for [negligent infliction of] emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury.”[12] It is undisputed that there was no physical impact to Coon. And although Georgia law permits an exception for certain pecuniary losses, the exception applies only to “a pecuniary loss resulting from an injury to the person which is not physical.”[13] Here, as the trial court concluded, the funeral and burial expenses incurred by Coon were not a direct result of the emotional injury experienced by Coon, but were a result of having a stillborn child. Thus, the funeral and burial expenses are not sufficient to overcome the impact rule requirement.
With respect to the costs associated with disinterment and reburial of the correct stillborn baby — which were not inevitable costs of having a stillborn baby — Coon contends that the collateral source rule bars the hospital from benefitting from its payment (or payments by others) of those costs on her behalf.[14] But, as the trial court observed, these costs were not a direct result of Coon’s mental *284 suffering. To trigger the exception to the impact rule, the pecuniary loss must result from the plaintiff’s injury, i.e., mental suffering, and here the disinterment and reburial costs did not arise from her injury, even though they arose from the hospital’s allegedly negligent conduct.[15] Thus, the trial court properly granted summary judgment to the hospital with regard to Coon’s claims for negligent infliction of emotional distress.
3. As for the intentional infliction of emotional distress claims, Coon
was required to show that (1) the conduct at issue was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the resulting emotional distress was severe. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law. Moreover, it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.[16]
Here, the trial court properly concluded the hospital was also entitled to summary judgment because the hospital’s conduct, while a “tragic mistake,” did not rise to the level of egregiousness or outrageousness necessary to sustain this claim.[17]
4. Finally, the trial court properly granted summary judgment as to Coon’s claim for punitive damages because it is derivative of her other claims which fail as a matter of law.[18]
*285 Accordingly, the trial court correctly granted summary judgment to the hospital.

Judgment affirmed.

Phipps, P. J., and Ray, J., concur. Boggs, J., concurs in judgment only. Andrews, P. J., and McMillian, J., concur fully in Divisions 2, 3 and 4 and specially in Division 1. Barnes, P. J., dissents.

 OCGA § 9-11-56 (c).

 Bank of North Ga. v. Windermere Dev., 316 Ga. App. 33, 34 (728 SE2d 714) (2012).

 The funeral home director later testified that when he received the stillborn baby from the hospital, he had chosen not to take the baby out of the cadaver bag or undress her because of the state of decomposition.

 Columbus Regional Healthcare System, Inc. was named as a defendant in the original complaint but later was dismissed from the case.

 Intl. Business Machines Corp. v. Kemp, 244 Ga. App. 638, 640 (1) (a) (536 SE2d 303) (2000). See Dowis v. Mud Slingers, Inc., 279 Ga. 808, 809, 816 (621 SE2d 413) (2005).

 (Punctuation omitted.) Risdon Enterprises v. Colemill Enterprises, 172 Ga. App. 902, 903 (1) (324 SE2d 738) (1984). See Kemp, 244 Ga. App. at 640-641 (1) (a) (noting that under the lex loci delicti rule, “the place of the wrong is where [the] injury is sustained”).

 See Kemp, 244 Ga. App. at 641 (1) (a).

 Under the public policy exception, we will not apply the law of the place where the injury was sustained if it would conflict with Georgia’s public policy. Cf. Alexander v. Gen. Motors Corp., 267 Ga. 339, 340-341 (478 SE2d 123) (1996) (applying Georgia law rather than Virginia law even though injury occurred in Virginia because Virginia products liability law violated Georgia public policy).

 See, e.g., Lee v. State Farm Mut. Ins. Co., 272 Ga. 583, 587-588 (II) (533 SE2d 82) (2000) (discussing policy implications of the impact rule and declining to abandon it).

 See Alexander, 267 Ga. at 341 (applying public policy exception because the lex loci was “radically dissimilar” from Georgia).

 That pleading alleged that Coon suffered “pecuniary loss, mental injury, anguish, and severe emotional distress.”

 (Punctuation omitted.) Lee, 272 Ga. at 584 (I), quoting Ryckeley v. Callaway, 261 Ga. 828 (412 SE2d 826) (1992).

 (Emphasis in original; punctuation omitted.) Ob-Gyn Assoc. of Albany v. Littleton, 259 Ga. 663, 666 (2) (B) (386 SE2d 146) (1989), overruled in part on other grounds by Lee, 272 Ga. at 588 (III), n. 8.

 See generally Candler Hosp. v. Dent, 228 Ga. App. 421 (491 SE2d 868) (1997) (“The common law rule in Georgia bars the defendant from presenting any evidence as to payments of medical, hospital, disability income, or other expenses of a tortious injury paid for by a plaintiff, governmental entity, or third party and taking credit towards the defendant’s liability in damages for such payments, because a tortfeasor is not allowed to benefit by its wrongful conduct or mitigate its liability by collateral sources provided by others.”).

 See Littleton, 259 Ga. at 666 (2) (B). Compare Nationwide Mut. Fire Ins. Co. v. Lam, 248 Ga. App. 134, 138 (2) (546 SE2d283) (2001) (plaintiff’s mental injury resulted in hospitalization for ten days and medical expenses totaling more than $12,000), questioned by Oliver v. McDade, 328 Ga. App. 368, 370 (2), n. 5 (762 SE2d 96) (2014), which was vacated in part by Oliver v. McDade, 297 Ga. 66 (772 SE2d 701) (2015).

 (Citation and punctuation omitted.) Canziani v. Visiting Nurse Health Systems, 271 Ga. App. 677, 679 (1) (610 SE2d 660) (2005).

 See id.

 See Veatch v. Aurora Loan Svcs., 331 Ga. App. 597, 602 (2) (771 SE2d 241) (2015).