300 Ga. 722
FINAL COPY

S16G0695.  COON v. THE MEDICAL CENTER, INC.

NAHMIAS, Justice.

Amanda Rae Coon lives in Alabama but received treatment from a hospital owned by The Medical Center, Inc. in Georgia.  After the hospital mishandled the remains of her stillborn baby, Coon filed this lawsuit.  Among other claims, she sought to recover damages for the negligent infliction of emotional distress.  The trial court ultimately entered an order granting summary judgment to the hospital.  The court applied Georgia's common-law "physical impact rule" to reject Coon's negligent infliction of emotional distress claim, rather than applying case law from the Alabama courts that allows such claims based on the mishandling of human remains.  Coon appealed, and the Court of Appeals affirmed, although the seven judges disagreed about the choice-of-law analysis.  See Coon v. The Medical Center, Inc., 335 Ga. App. 278 (780 SE2d 118) (2015).

We granted Coon's petition for certiorari primarily to review the Court of Appeals' analysis of the choice-of-law issue. The principal opinion of that court held that Georgia law governs Coon's claims based on the public policy exception to the rule of lex loci delicti for choosing which state's law applies to a tort claim. See Coon, 335 Ga. App. at 282-283. In dissent, Presiding Judge Barnes disagreed about the application of that exception. See id. at 288-291. We conclude that Judge McMillian's special concurrence identified the choice-of-law rule that actually applies in this context: where a claim in a Georgia lawsuit is governed by the common law, and the common law is also in force in the other state, as it is in Alabama, the common law as determined by Georgia's courts will control. See id. at 286-287. Because the Court of Appeals reached the right result, we affirm its judgment.

1. (a) The pertinent facts — when the evidence in the record is viewed in the light most favorable to Coon as the party opposing summary judgment — and the procedural history of the case in the trial court are recounted in the Court of Appeals' principal opinion as follows:

> Amanda Rae Coon lives in Opelika, Alabama. On February 8, 2011, Coon, who was 37[-]weeks pregnant, went for a routine prenatal examination at her obstetrician-gynecologist's office in

2

Columbus, Georgia. During the examination, Coon learned that her unborn baby did not have a heartbeat.

The following day, Coon was admitted to a Columbus hospital owned by The Medical Center, Inc. (the "hospital"), where her labor was induced and she delivered a stillborn baby girl. After the delivery, the hospital's bereavement coordinator spoke with Coon and her father, who informed the coordinator that the remains of the baby were to be released to a funeral home in Opelika. The bereavement coordinator completed a mortuary permit and supporting documents that included the pertinent funeral home information and placed these documents with Coon's patient chart.

The stillborn baby initially remained with Coon in her hospital room, but Coon's mother later informed the bereavement coordinator that Coon was tired and asked that the baby be removed. The coordinator placed Coon's baby in a separate holding room on the same floor until someone could take the baby to the hospital morgue. In addition to Coon's baby, there was a smaller stillborn baby boy, who was less than 20 weeks in gestation, already in the holding room.

When the bereavement coordinator placed Coon's baby in the holding room with the smaller baby, the hospital floor was in the middle of the evening shift change. A nurse whose shift had just begun volunteered to transport both babies from the holding room to the morgue. Under a hospital policy put into effect two days earlier, identification tags were to be placed on the arm and leg of a stillborn baby and on the outside of the cadaver bag before being delivered to the morgue. The nurse filled out the three tags for both of the babies.

The nurse had not yet had an opportunity to affix the identification tags when a hospital security guard came to the floor and asked the nurse if she was ready for him to escort her to the morgue with the babies. Because the babies were not yet prepared for transport to the morgue, the security guard decided to assist the nurse with the placement of the identification tags. The security guard had never tagged a deceased baby, and his job duties did not

include tagging the remains of deceased patients or preparing them for transport to the morgue.

When the security guard began assisting the nurse, they mixed up the identification tags. The nurse tagged the smaller baby with the identification tags for Coon's baby, and the security guard tagged Coon's baby with the identification tags for the smaller baby. The security guard placed a tag on the outside of the cadaver bag for Coon's baby, but chose not to "fool" with the tags on the baby's body because he did not want to remove any of the baby's clothing. The nurse repeatedly told the security guard that he needed to place identification tags on the body of Coon's baby, but he chose not to do so.

The nurse and security guard transported the stillborn babies to the morgue with the wrong identification tags and logged in the remains. Because of the incorrect identification tags, the hospital mistakenly released the wrong baby to the Opelika funeral home.

On February 12, 2011, Coon, her family members, and other mourners attended a funeral at an Opelika cemetery for a deceased stillborn baby whom they believed was Coon's. Coon and her family members did not view the baby's remains before or during the funeral service after the funeral director advised against it, given the condition of the remains.[1] The costs of transporting the baby from the hospital to the funeral home were paid by Coon's husband through the military, and Coon's aunts paid for the funeral service and donated the burial plot.

On February 23, 2011, the hospital discovered that it had released the wrong baby to the Opelika funeral home. The hospital contacted the director of the Opelika funeral home, informed him of the mistake, and requested contact information for Coon's family. The funeral director advised the hospital to contact Coon's

---

[1] The funeral home director later testified that when he received the stillborn baby from the hospital, he had chosen not to take the baby out of the cadaver bag or undress the baby because of the state of decomposition.

4

father rather than Coon herself because "mentally, she [would] just not [be] able to take it" if she learned of the mistaken identification.

Later that day, the hospital's chief executive officer contacted Coon by telephone and informed her that the hospital had released the wrong baby for burial. The following day, the baby who had been mistakenly released to the funeral home was exhumed from the Opelika cemetery. The funeral home director then traveled to Columbus to deliver the exhumed baby to a different funeral home and to retrieve Coon's baby from the hospital.

After the exhumed baby's remains were handed over to the representative of another funeral home, the Opelika funeral director retrieved a cadaver bag from the hospital morgue that had an identification tag for Coon's baby on the outside of it. Yet, when the director returned to his funeral home in Opelika, he discovered that the cadaver bag contained nothing but a blanket, and he had to return again to the hospital morgue to obtain Coon's baby, whom hospital employees had left in a holding room in the morgue. In violation of hospital policy, no documentation was made in the morgue log book showing when Coon's baby or the exhumed baby were returned to the morgue or to show when the switch occurred and who was involved.

Once the funeral director obtained the proper remains from the hospital, Coon's baby was buried at the Opelika cemetery. The hospital paid the costs associated with the exhumation of the misidentified baby and the subsequent burial of the correct remains. Coon did not attend the second burial because she "could not handle having to go through that all over again."

In March 2011, Coon filed the present lawsuit against the hospital, seeking damages for the emotional distress she suffered as [a] result of the mishandling of her stillborn child's remains.[2] Following discovery, the hospital moved for summary judgment, contending that Coon's emotional distress claims failed under

---

[2] Columbus Regional Healthcare System, Inc. was named as a defendant in the original complaint but later was dismissed from the case.

Georgia law because Coon suffered no physical injury or pecuniary loss and the conduct of the hospital was not intentional, reckless, extreme, or outrageous. In response, Coon argued that Alabama law applied under the choice-of-law rule of lex loci delicti because she suffered the relevant emotional distress in Opelika, where she learned of the hospital's mistake and the funeral service, burial, exhumation, and reburial had occurred. Coon further argued that under Alabama law, she was not required to prove physical injury, pecuniary loss, or intentional or reckless misconduct to support an emotional distress claim for the mishandling of human remains.

The trial court concluded that Alabama law applied and denied the hospital's motion for summary judgment. When the hospital moved for reconsideration, the trial court denied the motion but certified its order for immediate review. The hospital then filed an application for interlocutory appeal. [The Court of Appeals] initially granted the application but later dismissed it as improvidently granted.

Following the dismissal of the appeal, the hospital filed a renewed motion for summary judgment, contending that Alabama law should not apply under the public policy exception to the lex loci delicti rule and that all of Coon's claims failed under Georgia law. The trial court agreed with the hospital, concluding that the application of Alabama law would contravene Georgia public policy because Alabama, unlike Georgia, does not have an "impact rule" in emotional distress cases involving the negligent mishandling of human remains. Applying Georgia law rather than Alabama law, the trial court further concluded that Coon's claims failed as a matter of law under the more stringent standard for emotional distress claims in Georgia. Consequently, the trial court granted the hospital's renewed motion for summary judgment, resulting in [an] appeal by Coon.

Coon, 335 Ga. App. at 279-282 (footnotes renumbered).

6

(b) In a seven-judge decision, the Court of Appeals affirmed the trial court's judgment. Chief Judge Doyle wrote the principal opinion, which was joined in full by Presiding Judge Phipps and Judge Ray; then-Judge Boggs concurred in the judgment only; Judge McMillian wrote a special concurrence as to the choice-of-law issues, which Presiding Judge Andrews joined; and Presiding Judge Barnes wrote a dissenting opinion.[3] At least six of the judges agreed that the proper starting point for the choice-of-law analysis was the rule of lex loci delicti, which requires application of the tort law of the state where the tort was committed, and that a tort is "committed" where the injury is suffered rather than where the tortfeasor acts. See Coon, 335 Ga. App. at 282 (plurality opinion of Doyle, C. J.), 285-286 (McMillian, J., concurring specially), 288 (Barnes, P. J., dissenting). Beyond that, the choice-of-law approaches diverged.

Division 1 of the principal opinion, which spoke only for a plurality of three judges, concluded that it was unnecessary to decide whether the trial court

---

[3] Chief Judge Doyle wrote for five judges in Divisions 2, 3, and 4 of the principal opinion, which affirmed the trial court's rulings regarding Coon's claim for intentional infliction of emotional distress, her arguments on pecuniary loss and the collateral source rule, and her request for punitive damages. See Coon, 335 Ga. App. at 283-285; id. at 285 n.19 (McMillian, J., concurring specially). Those rulings are not at issue here.

7

correctly ruled that the injury alleged was suffered in Alabama. See Coon, 335 Ga. App. at 282. Instead, the principal opinion relied on the public policy exception to the rule of lex loci delicti to conclude that Georgia tort law should apply even if the tort was committed in Alabama. See id. at 282-283. "Under the public policy exception, [the Georgia court] will not apply the law of the place where the injury was sustained if it would conflict with Georgia's public policy." Id. at 282 n. 8. The principal opinion cited the public policy behind Georgia's physical impact rule limiting liability for emotional distress damages in negligence cases, as discussed by this Court in Lee v. State Farm Mutual Ins. Co., 272 Ga. 583 (533 SE2d 82) (2000).

Judge McMillian's special concurrence agreed that Lee governs Coon's claims, but not because of the public policy exception to the lex loci delicti rule, which she found unnecessary to consider. See Coon, 335 Ga. App. at 285, 287. Instead, the special concurrence agreed with the trial court that the alleged injury was suffered in Alabama and thus "the law of the state of Alabama controls." Id. at 285. The special concurrence concluded that in determining what that law is, it was bound by this Court's precedents to follow certain presumptions, even if they "may seem anachronistic and peculiar." Id. at 286 n. 22. The special

concurrence presumed that Coon's emotional distress claims were governed by the common law, because Alabama "'was formed from a part of the territory of Georgia,'" which was one of the original 13 colonies that followed the English common law, and "Coon does not contend that an Alabama statute governs her claims." Id. at 287 (citation omitted). The special concurrence further presumed that Alabama follows the same common-law approach to the recovery of emotional distress damages as Georgia — regardless of what the courts of Alabama might say on the subject — because "the 'common law is presumed to be the same in all the American States where it prevails,'" and "not only are [Georgia] courts 'competent to decide' what the common law is, 'but it is [our] duty to decide, the common law being the same in both jurisdictions.'" Id. at 286 (quoting Slaton v. Hall, 168 Ga. 710, 716 (148 SE 741) (1929), and Krogg v. Atlanta & West Point R., 77 Ga. 202, 214 (1886)).

In her solo dissent, Presiding Judge Barnes agreed that the alleged injury was suffered in Alabama, where Coon received the telephone call informing her of the hospital's mistake, which is what triggered her emotional distress. See Coon, 335 Ga. App. at 288-289. The dissent disagreed with the principal opinion on the application of the public policy exception to the rule of lex loci

9

delicti, noting that the party invoking the exception bears the burden of showing that the law of the state where the tort was committed "is so 'radically dissimilar to anything existing in our own system of jurisprudence' that it would 'seriously contravene' the policy embedded in Georgia law." Id. at 289 (quoting Southern R. v. Decker, 5 Ga. App. 21, 25, 29 (62 SE 678) (1908)). The dissent argued that allowing the application of Alabama tort law to a claim for the mishandling of human remains in the limited circumstances where the rule of lex loci delicti requires the application of Alabama law would pose no risk of flooding Georgia courts with amorphous, potentially fraudulent emotional distress claims where proving the causal connection between the negligent conduct and the claimed emotional distress damages would be difficult. See id. at 288-291 (citing Lee, 272 Ga. at 587). Accordingly, the dissent would have remanded the case for the trial court to apply Alabama law in deciding whether the hospital was entitled to summary judgment on Coon's emotional distress claims. See id. at 291-292.

(c) This Court granted Coon's petition for certiorari, which focused on the choice-of-law issue. The case was orally argued on September 13, 2016, and the parties then filed supplemental briefs. As explained below, we conclude that the choice-of-law approach followed by Judge McMillian's special concurrence was

10

generally correct, although it omitted the final part of the legal analysis

necessary to reject Coon's claim for negligent infliction of emotional distress.[4]

2.  The principles governing this case trace back to the first years of this

Court's existence.  From the beginning, this Court has distinguished between

---

[4] Coon's initial brief in this Court argued that the Court of Appeals' principal opinion misapplied the public policy exception and urged this Court to follow the approach taken by the dissent.  Coon's brief did not address Judge McMillian's special concurrence.  The hospital's brief in response argued that: (1) the Court of Appeals correctly concluded that Georgia law, rather than Alabama law, applies to Coon's claim for negligent infliction of emotional distress based on the approach of the principal opinion or, alternatively, the approach taken by the special concurrence; and (2) applying Georgia law, the facts of this case do not warrant the creation of a new exception to the rule precluding the recovery of damages for negligent infliction of emotional distress in the absence of a showing of pecuniary loss or physical impact to the plaintiff.  At oral argument, the Court questioned Coon's counsel about her position on the special concurrence's choice-of-law approach, and she filed a supplemental brief presenting her arguments on that question.  The hospital filed a supplemental brief disputing these arguments, and the Georgia Defense Lawyers Association filed an amicus brief supporting the hospital.

In her dissent, Presiding Judge Barnes asserted that it was inappropriate to rely on the special concurrence's approach to affirm the grant of summary judgment to the hospital under the right-for-any-reason doctrine, because that approach was not raised by either party in the trial court or in the Court of Appeals, so Coon had "no opportunity to respond to the argument or explain whether there are any Alabama statutes that bear on her claims." Coon, 335 Ga. App. at 291.  In the trial court and on appeal, the parties did litigate the issue of which state's law applies to Coon's claims, and courts should strive to render legally correct rulings on the issues the parties raise regardless of what cases the parties cite.  See, e.g., State v. Easter, 297 Ga. 171, 173-174 & n. 2 (773 SE2d 181) (2015) (reversing a decision of the Court of Appeals based on a precedent of this Court that the parties failed to cite in the Court of Appeals).  But we need not definitively resolve whether the proper framing of the choice-of-law analysis is a necessary part of the choice-of-law legal analysis or instead a discrete legal issue.  Neither Division 1 of the principal opinion nor the special concurrence was joined by a majority, making both of their approaches a basis for the Court of Appeals' result; the special concurrence's approach was thus subsumed within the broad question this Court posed in granting certiorari, as shown by the hospital's devoting a section of its initial brief to that approach; at oral argument, the Court questioned Coon's counsel about her position on the approach; and as mentioned above, the Court then gave Coon an opportunity to file a supplemental brief addressing the approach, which she did.  At this stage of the proceedings, therefore, the issue has been squarely raised and fully briefed.

11

statutory law and common law when the law of another state provides the rule of decision in a lawsuit filed in a Georgia court. As a matter of comity, a Georgia court will defer to another state's statutes, as well as its judicial decisions authoritatively interpreting those statutes, in determining the law of that state. See Cox v. Adams, 2 Ga. 158, 159-161, 164-166 (1847) (reversing the trial court's ruling disregarding the effect of Alabama statutes, and the Alabama Supreme Court's interpretation of them, in a lawsuit by a Georgia resident to collect on a contract that the defendant entered into in Alabama).

In the absence of a statute, however, at least with respect to a state where the common law is in force, a Georgia court will apply the common law as expounded by the courts of Georgia. See Latine v. Clements, 3 Ga. 426, 430 (1847) (relying on this Court's analysis of the common law to determine the effect in Virginia of a Virginia court judgment against an executor, given the absence of any "statute law of Virginia which defines the faith and credit to which [the judgment] is there entitled"). If this Court is persuaded that the understanding of the relevant principle of the common law offered by the courts of the other state (or of other common-law courts, for that matter) is superior to our own, we may adopt that position and apply it to the case at hand. In that

12

instance, however, this Court would still be applying our conclusion regarding the common law, and the same rule would apply in future Georgia cases with no out-of-state element.

This approach may seem anachronistic to lawyers and judges trained and professionally steeped in relativist theories of legal realism. But the prevailing view at the time the doctrine was established was that there is one common law that can be properly discerned by wise judges, not multiple common laws by which judges make law for their various jurisdictions. As Judge McMillian's special concurrence recognized, this Court explicitly embraced this view in Krogg v. Atlanta & West Point R., 77 Ga. 202, which like this case involved a tort that allegedly occurred in Alabama. Faced with the choice-of-law question, we explained:

> [W]e are not bound by the interpretation of the common law, as made by the courts of Alabama; as to what is the common law on this subject, this court is not only competent to decide, although the accident occurred in Alabama, but it is [our] duty to decide, the common law being the same in both jurisdictions.

Id. at 214. And in another case on which the special concurrence relied, Slaton v. Hall, 168 Ga. 710 (148 SE 741) (1929), which also involved a tort in Alabama, we elaborated on the underlying theory:

13

The common law is presumed to be the same in all the American States where it prevails. Though courts in the different States may place a different construction upon a principle of common law, that does not change the law. There is still only one right construction. If all the American States were to construe the same principle of common law incorrectly, the common law would be unchanged.

Id. at 716. See also Lay v. Nashville, Chattanooga & St. Louis R. Co., 131 Ga. 345, 345 (62 SE 189) (1908) ("While the courts of this state will follow the decisions of a sister [s]tate in construing the statutes thereof, they are not bound by the interpretation placed upon the common law by the courts of other [s]tates.").[5]

This Court has followed the same approach in a nearly unbroken line of decisions, many of them involving torts in Alabama. See, e.g., Krogg, 77 Ga. at 214; Pattillo v. Alexander, 96 Ga. 60, 61 (22 SE 646) (1895); Alabama Midland R. Co. v. Guilford, 119 Ga. 523, 525 (46 SE 655) (1904); Southern R. Co. v. Cunningham, 123 Ga. 90, 94 (50 SE 979) (1905); Thomas v. Clarkson,

_____

[5] We have said that this approach will be followed if the other state was one of, or formed from the territory of one of, the original 13 colonies that inherited the common law of England. See Trustees of Jesse Parker Williams Hosp. v. Nisbet, 189 Ga. 807, 811 (7 SE2d 737) (1940). Because Alabama was formed predominantly from the territory of Georgia, we need not address today whether the common law also may apply in other states. See John D. Hadden, Green's Georgia Law of Evidence § 12:35 (Sept. 2016 update).

14

125 Ga. 72, 78 (54 SE 77) (1906); Seaboard Air-Line R. v. Andrews, 140 Ga. 254, 255, 257-259 (78 SE 925) (1913); Slaton, 168 Ga. at 716; Trustees of Jesse Parker Williams Hosp. v. Nisbet, 189 Ga. 807, 811 (7 SE2d 737) (1940); Motz v. Alropa Corp., 192 Ga. 176, 176 (15 SE2d 237) (1941). Many Court of Appeals cases and federal cases applying Georgia law also follow this approach. See, e.g., Calhoun v. Cullum's Lumber Mill, 247 Ga. App. 859, 862-863 & n.10 (545 SE2d 41) (2001); Risdon Enterprises, Inc. v. Colemill Enterprises, Inc., 172 Ga. App. 902, 904-905 (324 SE2d 738) (1984); Leavell v. Bank of Commerce, 169 Ga. App. 626, 626-627 (314 SE2d 678) (1984); Oliver v. Aetna Ins. Co., 102 Ga. App. 89, 89-90 (115 SE2d 647) (1960); Kirkpatrick v. J.C. Bradford & Co., 827 F2d 718, 725 n. 6 (11th Cir. 1987); Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F2d 1500, 1503 (11th Cir. 1983); Budget Rent-A-Car Corp. of America v. Fein, 342 F2d 509, 513-514 & n. 9 (5th Cir. 1965); Shorewood Packaging Corp. v. Commercial Union Ins. Co., 865 FSupp. 1577, 1581-1582 (N.D. Ga. 1994).

There was one notable exception. In Atlanta and Charlotte Air Line R. Co. v. Tanner, 68 Ga. 384 (1882), we deviated from this choice-of-law approach without recognizing the deviation. See id. at 390-391. But we later expressly

15

overruled <u>Tanner</u> and returned to the approach followed in our earliest cases. See <u>Slaton</u>, 168 Ga. at 716-717. Since then, we have never disavowed this choice-of-law approach.

3. In her supplemental brief, Coon offers three arguments against the traditional choice-of-law approach to common-law claims.

(a) First, while she concedes that "this Court has never expressly overruled" our precedents, Coon relies on a 1973 federal district court case, <u>Old Hickory Products Co. v. Hickory Specialties, Inc.</u>, 366 FSupp. 913 (N.D. Ga. 1973), to argue that a 1968 amendment to Georgia's rules of civil procedure, which authorized judicial notice of the law of other states and countries, supplanted the choice-of-law approach reflected in our decisional law. See Ga. L. 1968, p. 1104, § 10 (codified at OCGA § 9-11-43 (c)).[6] Despite its initial

_____

[6] OCGA § 9-11-43 (c) says:

> **Determination of the law of other jurisdictions.** A party who intends to raise an issue concerning the law of another state or of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining such law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the rules of evidence. The court's determination shall be treated as a ruling on a question of law.

See also Paul S. Milich, Georgia Rules of Evidence § 7:5, at p. 180 (2016-2017 ed.) ("[T]here are no limits on the sources the trial court can use to inform itself on foreign law and the court is not limited by what the parties provide but may research the 'question of law' on its own," citing OCGA §§ 24-2-220, 24-9-902 (5), and 24-9-922.). Thus, it is true that under OCGA § 9-11-43 (c), Coon could simply point to a relevant Alabama statute, if there were one, rather than being required to plead and prove the foreign law as before 1968. But she has conceded that no relevant Alabama

16

recognition that "'[t]he doctrine of judicial notice is not a conflict of laws rule,'" 366 FSupp. at 916 (citation omitted), the court in <u>Old Hickory</u> then based its conclusion on an improper conflation of Georgia's substantive choice-of-law approach with the procedural and evidentiary rules relating to a party's reliance on foreign law, see id. at 917-922.

As Coon acknowledges, a 1994 case from the same federal district explicitly repudiated this aspect of <u>Old Hickory</u>, which has never been followed by other federal courts. See <u>Shorewood</u>, 865 FSupp. at 1581-1582. See also <u>In re Tri-State Crematory Litigation</u>, 215 FRD 660, 677-679 (N.D. Ga. 2003) (recognizing, in a case involving contract and tort claims arising from the alleged mishandling of the remains of hundreds of bodies from funeral homes in Georgia, Alabama, and Tennessee, that "'[w]hen no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law'" (quoting <u>Frank Briscoe Co.</u>, 713 F2d at 1503)). More importantly, neither the Court of Appeals nor this Court has ever endorsed <u>Old Hickory</u>.

---

statute exists.

(b) Coon also argues that this Court's more recent choice-of-law cases have "implicitly overruled" our precedents articulating the traditional approach by failing to mention them. However,

> [i]t is axiomatic that the decisions of this Court do not stand for points that were neither raised by the parties nor actually decided in the resulting opinion, and that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."

Palmer v. State, 282 Ga. 466, 468 (651 SE2d 86) (2007) (citations omitted).

Moreover, nothing in the decisions Coon cites suggested that this Court had abandoned our traditional approach to deciding common-law questions when applying the law of another common-law state.[7] To the contrary, one of the cases Coon cites expressly recognized Nisbet as a "'leading Georgia case'" on Georgia's approach to choice of law. General Tel. Co. of Southeast v. Trimm,

---

[7] In three of the cases Coon cites, this Court held that Georgia law applied because the tort occurred in Georgia or the contract was made in Georgia and did not indicate that it was to be performed elsewhere. See Bullard v. MRA Holding, LLC, 292 Ga. 748, 750-751 (740 SE2d 622) (2013); Dowis v. Mud Slingers, Inc., 279 Ga. 808, 816 (621 SE2d 413) (2005); General Tel. Co. of Southeast v. Trimm, 252 Ga. 95, 95-96 (311 SE2d 460) (1984). Two other cases involved statutes rather than the common law. See Alexander v. Gen. Motors Corp., 267 Ga. 339, 340-341 (478 SE2d 123) (1996); Menendez v. Perishable Distribs., Inc., 254 Ga. 300, 301-302 (329 SE2d 149) (1985), abrogated on other grounds by Posey v. Medical Center-West, Inc., 257 Ga. 55 (354 SE2d 417) (1987). And in the final case, in answer to a certified question from the Eleventh Circuit, we confirmed that Georgia has not abandoned its traditional choice-of-law approach in contract cases in favor of the center of gravity test in the Restatement (Second) of Conflict of Laws § 188 (1971). See Convergys Corp. v. Keener, 276 Ga. 808, 810-812 (582 SE2d 84) (2003).

18

252 Ga. 95, 96 (311 SE2d 460) (1984) (citation omitted).  See also Avnet, Inc. v. Wyle Labs., Inc., 263 Ga. 615, 621 (437 SE2d 302) (1993) (citing Slaton approvingly).

(c) Coon's final argument is that Georgia's approach to determining the common law in force in other states is "archaic" and "has outlived its usefulness."  However, a precedent's antiquity is a factor that weighs in favor of adhering to it.  See Woodard v. State, 296 Ga. 803, 812 (771 SE2d 362) (2015).  See also Savage v. State of Ga., 297 Ga. 627, 639-641 (774 SE2d 624) (2015).  Moreover, the traditional approach is applied to contract as well as tort claims based on the common law, implicating significant reliance interests.  See Savage, 297 Ga. at 641-642.

In any event, our response to this argument is much the same as our response to complaints about other aspects of Georgia choice-of-law analysis that follow traditional, if now less popular, rules:  "Until it becomes clear that a better rule exists, we will adhere to our traditional approach."  Trimm, 252 Ga. at 96.  Accord Dowis v. Mud Slingers, Inc., 279 Ga. 808, 811 (621 SE2d 413) (2005) ("[I]t is well-settled that Georgia will continue to adhere to a traditional conflict of laws rule until a better approach is found."); Convergys Corp. v.

19

Keener, 276 Ga. 808, 812 (582 SE2d 84) (2003) ("[U]ntil we are convinced that there is a better approach, Georgia will continue to adhere to the traditional conflicts of law rules."). The approach Georgia has followed from the beginning as to common-law questions provides a workable rule, and Coon has not persuaded us that a much better rule has come along.

4. The final part of the analysis — the part that Judge McMillian did not expressly address in her special concurrence — is how the common law, as understood by Georgia courts, applies to the facts of this case, that is, how this case is properly decided under the common law. In Lee, 272 Ga. 583, we reaffirmed that Georgia follows the physical impact rule for claims of negligent infliction of emotional distress, which this Court first adopted in an 1892 decision. See id. at 584, 586-587 (citing Chapman v. Western Union Tel. Co., 88 Ga. 763 (15 SE 901) (1892)).[8] As we said in Lee,

> [i]n order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is

---

[8] Lee explained that in the absence of pecuniary loss, the following three elements are necessary to recover damages for emotional distress caused by negligence:

> (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress.

272 Ga. at 586.

impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited.

Id. at 586 n. 7 (citation and punctuation omitted). Although the physical impact rule sometimes produces "harsh results," id. at 586, it "provides a brighter line of liability and a clear relationship between the plaintiff's being a victim of the breach of duty and compensability to the plaintiff," id. at 587.

Lee did recognize a single, carefully circumscribed exception to the physical impact rule, authorizing recovery of damages by a parent where the parent and her child both suffered a physical impact that caused them both physical injuries, even if the parent's emotional distress arose not only from her physical injury but also from watching her child suffer and die. See id. at 588.[9] Coon suggests that we adopt another exception for her situation.

But the facts of this case, while tragic, do not warrant the creation of a new exception to the physical impact rule. Unlike the mother in Lee, who was

---

[9] The Court described the exception as follows:

When, as here, a parent and child sustain a direct physical impact and physical injuries through the negligence of another, and the child dies as the result of such negligence, the parent may attempt to recover for serious emotional distress from witnessing the child's suffering and death without regard to whether the emotional trauma arises out of the physical injury to the parent.

Lee, 272 Ga. at 588.

21

physically injured in the same accident that resulted in her child's death, Coon did not suffer any physical impact that resulted in physical injury from the hospital's negligent mishandling of her stillborn child's remains, nor did the child suffer any physical impact or injury. That element is critical, although not necessarily dispositive, in determining whether to recognize a new exception to the physical impact rule, because it goes far in addressing the concerns about unleashing a flood of claims for emotional distress and the ease with which fraudulent claims of emotional distress can be made. See id. at 587. See also id. at 586 n. 7 (explaining that while foreseeabilty "set[s] tolerable limits for [liability for] most types of physical harm, it proves virtually no limit on liability for nonphysical harm." (citations and punctuation omitted)). Indeed, Coon does not point to a limiting principle that would realistically distinguish her claim for an exception to the physical impact rule from any number of other situations where such an exception might be sought. If we do not insist on a workable limiting principle as a prerequisite to recognition of new exceptions to the physical impact rule, the exceptions will soon swallow the rule.[10]

---

[10] Presiding Judge Barnes suggested that an exception could be limited to cases involving torts in Alabama. See Coon, 335 Ga. App. at 290-291. But if this Court concluded that the common law properly provides for such an exception, it would then be applied in all common-law cases in

22

We agree with the Court of Appeals, which both before and after <u>Lee</u> has rejected the creation of an exception to the physical impact rule for cases involving the negligent mishandling of human remains. See <u>Hang v. Wages & Sons Funeral Home, Inc.</u>, 262 Ga. App. 177, 180-182 (585 SE2d 118) (2003) (involving the premature cremation of a family member's body before his viewing and funeral and post-cremation processing of the remains that removed bone fragments necessary for religious rituals); <u>Hall v. Carney</u>, 236 Ga. App. 172, 174 (511 SE2d 271) (1999) (involving the disinterment and removal of recently reburied remains of the plaintiff parents' stillborn child).

<u>Judgment affirmed. All the Justices concur, except Boggs, J., disqualified.</u>

Decided March 6, 2017.

Certiorari to the Court of Appeals of Georgia — 335 Ga. App. 278.

<u>Beasley, Allen, Crow, Methvin, Portis & Miles, Archie I. Grubb II; F. Houser Pugh</u>, for appellant.

<u>Hall Booth Smith, W. Scott Henwood, Paul D. Ivey, Jr., Mark W. Wortham, Lauren K. Dimitri</u>, for appellee.

---

Georgia courts, even those with no out-of-state element.

Goodman, McGuffey, Lindsey & Johnson, Robert A. Luskin, James T. Hankins III, amici curiae.