**THIRD DIVISION**
**DOYLE, P. J.,**
**MERCIER, J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

January 26, 2023

# In the Court of Appeals of Georgia

A22A1231. UNITED PARCEL SERVICE OF AMERICA, INC. et al. v. WHITLOCK et al.

A22A1232. LIBERTY MUTUAL FIRE INSURANCE COMPANY v. WHITLOCK et al.

A22A1233. REYNOLDS v. WHITLOCK et al.

A22A1234. UNITED PARCEL SERVICE OF AMERICA, INC. v. WHITLOCK et al.

A22A1235. REYNOLDS v. WHITLOCK et al.

A22A1236. LIBERTY MUTUAL FIRE INSURANCE COMPANY v. WHITLOCK et al.

PHIPPS, Senior Appellate Judge.

These cases address wrongful death and survival actions arising from two collisions involving three vehicles that occurred on Interstate 85 in South Carolina, at approximately 1:30 a.m. on May 2, 2018. The incident resulted in the deaths of Jeff Virgil Whitlock, Jr. ("Jeff Whitlock") and Jarett Whitlock and the permanent injury

of non-party Stewart Hamilton. The appeals before us concern two interlocutory issues: (1) choice of law and (2) spoliation of evidence.

The records show that Martha Whitlock, individually and as Executrix of the Estate of Jeff Whitlock (the "Jeff Whitlock lawsuit"), and Aaron Whitlock and Kathy Black, individually and as Executors of the Estate of Jarett Whitlock (the "Jarett Whitlock lawsuit") (collectively the "plaintiffs"), filed separate lawsuits[1] against United Parcel Service of America, Inc. ("UPS"), TeamOne Contract Services, LLC d/b/a TeamOne Logistics ("TeamOne"), Brian Reynolds, and Liberty Mutual Fire Insurance Company ("Liberty Mutual") (collectively the "defendants").[2] The lawsuits

---

[1] The Jeff Whitlock and Jarett Whitlock lawsuits were docketed separately, but the state court consolidated them for discovery purposes.

[2] Although the November 2018 complaints list United Parcel Service, Inc. and TeamOne Contract Services, LLC d/b/a TeamOne Logistics, LLC, as defendants, the parties subsequently filed a consent motion to correct misnomers, substitute party, and dismiss parties, and a December 2018 consent order dismissed without prejudice defendants United Parcel Service, Inc. and TeamOne Logistics, LLC and "substitute[d] and add[ed] as . . . parties-defendant UPS Ground Freight, Inc. and TeamOne Contract Services, LLC d/b/a TeamOne Logistics." Thereafter, the parties filed a joint motion to substitute United Parcel Service of America, Inc. as the proper UPS defendant in this action, and the trial court granted that motion. Orders in the cases have been issued with the caption containing both UPS Ground Freight, Inc. and United Parcel Service of America, Inc. as party-defendants. The parties will simply be referred to in this opinion as "UPS" and "TeamOne."

sought damages for wrongful death, pain and suffering, medical and funeral expenses, and attorney fees and litigation expenses, as well as punitive damages. According to the complaints, Reynolds was generally negligent in a number of respects, and his violations of motor vehicle laws constituted negligence per se. The complaints further alleged that UPS and TeamOne were liable for (i) Reynolds's actions under theories of vicarious liability, (ii) negligent supervision, hiring, training, and retention of Reynolds, (iii) negligent entrustment of a tractor-trailer to Reynolds, and (iv) the failure to promulgate and enforce safety policies.

It is undisputed that an initial collision occurred when Jeff Whitlock rear-ended non-party Hamilton's tractor-trailer. According to Hamilton, he pulled his truck off the highway, exited the truck, and approached Whitlock's vehicle, which had also pulled onto the shoulder. As Hamilton approached Whitlock's vehicle, he noticed another tractor-trailer headed towards them. That tractor-trailer was leased to UPS and was being driven by Reynolds, who was working as an employee of TeamOne. Liberty Mutual provided a liability insurance policy on behalf of UPS that was in effect at the time of the incident.

The plaintiffs claim that Reynolds crashed into the vehicles involved in the initial incident, killing the Whitlocks and injuring Hamilton. Multiple witnesses,

3

including other interstate tractor-trailer drivers, and a dash cam video recording obtained from one such tractor-trailer, show that Reynolds had been driving erratically for miles, including swerving in and out of traffic, failing to maintain his lane, and running one of the eyewitnesses off the roadway on at least three occasions. The defendants, on the other hand, assert that Jarett Whitlock died as a result of the initial collision with Hamilton and that Jeff Whitlock subsequently died as a result of the second collision with Reynolds. The defendants also claim that the vehicles involved in the initial collision were not completely out of the roadway when Reynolds struck them; however, testimony and a dash cam video recording indicate that the vehicles were clearly visible for at least a quarter of a mile and that Reynolds only applied his brakes "a split second before the impact."

During the course of the litigation, UPS and Reynolds filed motions to preclude foreign law, arguing that the trial court should apply Georgia's wrongful death, survival, and punitive damages statutes, rather than South Carolina's. It is undisputed that (i) the plaintiffs, the Whitlock decedents, and Reynolds are all Georgia residents, (ii) TeamOne is a Georgia corporation and UPS is a Delaware corporation, but both are headquartered in Georgia, and (iii) Liberty Mutual is authorized to transact business and has a registered agent in Georgia. On May 7, 2020, the trial court issued

4

an order granting the defendants' motions to preclude foreign law. Specifically, the trial court found that (i) South Carolina's wrongful death statutes contravene Georgia public policy and therefore Georgia's wrongful death statutes apply, (ii) Georgia common law applies to survival claims for the decedents' pre-death pain and suffering, and (iii) although punitive damages are a matter of substantive, rather than procedural law, South Carolina punitive damages law contravenes Georgia's public policy as expressed in its punitive damages law and therefore Georgia punitive damages law applies in these cases.

On October 9, 2020, the plaintiffs filed a motion for reconsideration following the Supreme Court of Georgia's ruling in *Auld v. Forbes*, 309 Ga. 893 (848 SE2d 876) (2020), a case addressing choice of law related to a drowning death in Belize. On November 23, 2021, the trial court issued a new order in light of *Auld* and determined that South Carolina law would apply to the plaintiffs' claims for wrongful death and punitive damages, as well as any apportionment of fault between the parties, but Georgia law would apply to the plaintiffs' survival claims. In addition, the trial court entered a separate order granting an adverse inference jury instruction against all defendants for alleged spoliation of evidence. This Court granted interlocutory review of the choice of law issue, and these appeals followed.

In Case No. A22A1231, UPS and TeamOne appeal the trial court's choice of law and spoliation sanction orders in the Jeff Whitlock lawsuit. In Case No. A22A1232, Liberty Mutual appeals the trial court's spoliation sanction order in the Jeff Whitlock lawsuit. In Case No. A22A1233, Reynolds appeals the trial court's choice of law and spoliation sanction orders in the Jeff Whitlock lawsuit. In Case No. A22A1234, UPS and TeamOne appeal the trial court's choice of law and spoliation sanction orders in the Jarett Whitlock lawsuit. In Case No. A22A1235, Reynolds appeals the trial court's choice of law and spoliation sanction orders in the Jarett Whitlock lawsuit. In Case No. A22A1236, Liberty Mutual appeals the trial court's spoliation sanction order in the Jarett Whitlock lawsuit. In the interest of judicial economy, we have consolidated these cases for review.[3] For the reasons that follow,

[3] Although Reynolds and Liberty Mutual did not file or join in the application for interlocutory appeal from the November 23, 2021 choice of law order, they are entitled to file cross-appeals since "a co-defendant below[] is an 'appellee' entitled to file a cross-appeal pursuant to OCGA § 5-6-38 (a) seeking review of an interlocutory matter so long as the main appeal is properly before us." *Ga. DOT v. Strickland*, 279 Ga. App. 753, 755-756 (3) (632 SE2d 416) (2006) (footnote omitted). In addition, although the spoliation of evidence issue was not raised in the applications for interlocutory appeal, we are authorized to exercise jurisdiction over the subsequently-entered spoliation order pursuant to OCGA § 5-6-34 (d) because it was issued prior to the notice of appeal being filed from the grant of the interlocutory appeal. See *Southeast Ceramics v. Klem*, 246 Ga. 294, 295 (1) (271 SE2d 199) (1980) ("[W]hen a direct appeal is taken, any other judgments, rulings or orders rendered in the case and which may affect the proceedings below may be raised on appeal and

we affirm the trial court's order with respect to the choice of law issues, but we vacate and remand with direction the trial court's order regarding the spoliation of evidence sanction.

1. *Choice of law*. Defendants UPS, TeamOne, and Reynolds first assert that the trial court erroneously determined that South Carolina law, rather than Georgia law, should apply to the availability of punitive damages and the apportionment of fault in these actions. The question at issue in these cases is whether the trial court properly applied the Supreme Court of Georgia's decision in *Auld*, supra. This is a question of law that we review de novo. See *Mbatha v. Cutting*, 356 Ga. App. 743, 747 (2) (848 SE2d 920) (2020).

(a) *Auld v. Forbes*. In *Auld*, a student from Cobb County, Georgia, died on a school trip to Belize, and his mother filed a wrongful death lawsuit in Georgia against one or more Belizean defendants and several Georgia defendants. 309 Ga. at 893 (1). The lawsuit was filed outside the applicable limitation period provided for under Belize law but within the period applicable under Georgia law. Id. The trial court dismissed the case, finding that the one-year limitation period under the Belize Law of Torts Act barred the claims against all defendants. Id. We reversed the trial court's

reviewed and determined by the appellate court.").

7

order, concluding that Georgia's two-year statute of limitation on wrongful death claims applied, but the Supreme Court of Georgia reversed this Court's opinion. Id. at 894 (1).

In its opinion, the Supreme Court noted that when a tort action is filed in a Georgia court for a harm sustained in an out-of-state jurisdiction, the Georgia court must determine which jurisdiction's laws apply to the claims. *Auld*, 309 Ga. at 894 (2). In so doing, "Georgia law differentiates between substantive and procedural law . . . and determines which law will apply to the case through the doctrines of lex loci delicti (the law of the place where the injury was sustained) and lex fori (the law of the forum state)." Id. In particular, Georgia follows the doctrine of lex loci delicti in tort cases, "pursuant to which a tort action is governed by the substantive law of the state where the tort was committed," but matters of procedure are "governed by the lex fori or the law of the forum state." Id. at 894-895 (2) (a) (citations and punctuation omitted). The Supreme Court noted that although

> statutes of limitation are generally procedural and are therefore governed by the 'lex fori' or the law of the forum state[] . . . when the applicable foreign law creates a cause of action that is not recognized in the common law and includes a specific limitation period, that limitation period is a substantive provision of the foreign law[,] that governs, and

8

it applies when it is shorter than the period provided for under Georgia law.

Id. at 895 (2) (a). Because no common law right existed to file a wrongful death claim in Georgia, and because Belize's Law of Torts Act created a cause of action for wrongful deaths occurring in Belize and imposed a one-year limitation period to bring such a claim, the Supreme Court concluded that Belize's substantive law should determine the statute of limitation, unless doing so would violate Georgia public policy. Id. at 895-896 (2) (a).

Although the Supreme Court recognized "a public policy exception to lex loci delicti" — "whereby the Georgia court will not apply the law of the place where the injury was sustained if it would conflict with Georgia's public policy" — it limited the exception to instances where the out-of-state law "is so radically dissimilar to anything existing in our own system of jurisprudence that it would seriously contravene the policy embedded in Georgia law." *Auld*, 309 Ga. at 896 (2) (b) (citations and punctuation omitted). The Court specifically stated: "A mere difference in law is not sufficient to justify this exception. We hereby disapprove of cases where the public policy exception has been construed more liberally." Id.

9

As a starting point for considering Georgia's public policy, the Supreme Court noted that trial courts should consider how Georgia law would address extraterritorial application of a claim based on a Georgia statute. *Auld*, 309 Ga. at 896 (2) (b). For example, in *Auld*, the Court concluded that Georgia's longstanding precedent holds that our wrongful death statute "does not have extraterritorial application." Id. at 896-897 (2) (b). In other words, "Georgia law affords a remedy for wrongful death in Georgia, but no remedy at all for a wrongful death that occurs outside the state." Id. at 897-898 (2) (b). Accordingly, the mother in *Auld* would be unable to pursue a claim under Georgia law for a death that occurred in Belize. Id. at 897 (2) (b). The Supreme Court further concluded that there was no public policy violation in applying Belize's substantive limitation period because, although the countries' remedies for wrongful death differed "in several particulars, Belize law afford[ed] a remedy for a wrongful death in Belize." Id. at 898 (2) (b). In summary, the Supreme Court held that, "although wrongful death claims recognized under Belize law provide[d] a somewhat different remedy than wrongful death claims brought under Georgia law . . ., Belize's wrongful death law [was] not so radically dissimilar that it [could not] be applied by Georgia courts." Id. at 898 (2) (b).

10

The trial court in the present cases noted that *Auld* "significantly changed the calculus as to the public policy exception," and, "[v]iewing the South Carolina wrongful death statute through the new lens of *Auld*," the court found that "South Carolina's wrongful death statute is not so radically dissimilar" to Georgia law "as to prohibit its application in th[ese] case[s]." The trial court further found that South Carolina's punitive damages and apportionment statutes also are not so radically dissimilar to Georgia law as to require an application of Georgia law. However, the court held that *Auld* did not affect choice of law rules as applied to common law claims, and therefore Georgia law would apply to the plaintiffs' survival claims.

With this background in mind, we turn to the defendants' claims of error. The defendants argue that the trial court erred in ruling that South Carolina statutory law controls the punitive damages and apportionment issues in these cases because the court failed to (i) apply Georgia's comity statute, and (ii) find radical dissimilarities between South Carolina's and Georgia's punitive damages and apportionment of fault statutes sufficient to apply Georgia rather than South Carolina law.

(b) *Comity*. Citing numerous cases from the 1800s, the defendants assert that the trial court erred in relying on *Auld* to reverse its prior ruling that Georgia punitive

11

damages and apportionment statutes should apply in these cases because *Auld* did not

analyze or apply Georgia's longstanding comity statute. We disagree.

"As a matter of comity, a Georgia court will defer to another state's statutes,

as well as its judicial decisions authoritatively interpreting those statutes, in

determining the law of that state." *Coon v. The Med. Center, Inc.*, 300 Ga. 722, 729

(2) (797 SE2d 828) (2017). Georgia's comity statute states as follows:

> The laws of other states and foreign nations shall have no force and
> effect of themselves within this state further than is provided by the
> Constitution of the United States and is recognized by the comity of
> states. The courts shall enforce this comity, unless restrained by the
> General Assembly, so long as its enforcement is not contrary to the
> policy or prejudicial to the interests of this state.

OCGA § 1-3-9. Thus, Georgia courts will enforce foreign law unless (i) courts are

restrained by the General Assembly, (ii) the foreign law is contrary to Georgia policy,

or (iii) the foreign law is prejudicial to the interests of this State. Id. According to the

defendants, the Supreme Court in *Auld* failed to consider the prejudicial interest

exception under the comity statute, and *Auld* therefore should be limited to its facts

and to cases in which the claim was extinguished under the law of the place where the

tort occurred.

The plaintiffs assert at the outset that the defendants have waived this prejudicial interest exception argument by failing to raise it in the trial court. The defendants counter that they preserved the argument, claiming they used the word "comity" 13 times in their trial court briefs and that the trial court considered the comity statute in its orders. However, while the comity statute itself and its concomitant public policy exceptions were mentioned below, the defendants failed to specifically raise any argument regarding the prejudicial interest exception. And the comity statute was not mentioned at all during the motions hearings. It is axiomatic that "this Court cannot hear arguments raised for the first time on appeal." *Golden Peanut Co. v. Miller*, 363 Ga. App. 384, 388 (2) (a) (870 SE2d 511) (2022); accord *AKA Mgmt. v. Branch Banking & Trust Co.*, 275 Ga. App. 615, 619 (2) (a) (621 SE2d 576) (2005) ("We are limited to considering only those grounds raised and ruled on below by the trial court and may not consider a basis for appeal not presented at the trial level.") (citation and punctuation omitted). Accordingly, we agree with the plaintiffs that the defendants have waived their prejudicial interest exception argument by failing to raise it in the trial court.

Regardless, this comity argument fails. Although the defendants argue that *Auld* "did not analyze or apply the comity statute," the Supreme Court in *Auld* cited

13

the comity statute, including its full text in a footnote. 309 Ga. at 896 (2) (b), n. 3. The Court then analyzed the statute's public policy exception and ruled that "[a] mere difference in law is not sufficient to justify this exception." Id. at 896 (2) (b). Although the prejudicial interest portion of the exception was not specifically mentioned in *Auld*, neither was that portion of the exception specifically mentioned or argued by the defendants below, as noted above. In any event, if *Auld* is flawed, it is for the Supreme Court, not this Court, to correct or modify it, as this Court is bound by the Supreme Court's reading of a statute as surely as we are by any decisions of that tribunal. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI ("The decisions of the Supreme Court shall bind all other courts as precedents."). As this Court previously has noted, "[t]his mandate is not contingent, and the Court of Appeals is not at liberty to modify Supreme Court precedent." *Zachery v. State*, 233 Ga. App. 519, 521 (504 SE2d 466) (1998).

(c) *Radical Dissimilarities*. In *Auld*, the Supreme Court highlighted that the narrow public policy exception to lex loci delicti "applies only if the out-of-state law is so radically dissimilar to anything existing in our own system of jurisprudence that it would seriously contravene the policy embodied in Georgia law." 309 Ga. at 896

14

(2) (b) (citation and punctuation omitted). "A mere difference in law is not sufficient to justify this exception." Id.

The defendants contend that there are radical differences in Georgia's and South Carolina's laws on punitive damages and apportionment, so that the narrow public policy exception set forth in *Auld* would apply to those laws. Our duty following the Supreme Court's pronouncement in *Auld* is to (i) determine whether the issue involves procedural or substantive law, and (ii) if the issue involves substantive law, to which the doctrine of lex loci delicti will apply, determine whether South Carolina's law is radically dissimilar to anything existing in Georgia law. 309 Ga. at 894-896 (2) (a)-(b).

(i) *Punitive damages*. We turn first to the defendants' claims with respect to punitive damages. In a footnote, the defendants argue that the trial court erred in concluding that punitive damages are a matter of substantive, rather than procedural, law and in applying lex loci delicti and South Carolina law instead of lex fori and Georgia law on that basis. The defendants cite an opinion from the Eleventh Circuit Court of Appeals, which stated:

> While California law governs the substantive issues of the slander claim, under Georgia choice of law principles, issues of remedy are

15

governed by the law of the forum state. *Menendez v. Perishable Distributors Inc.*, 254 Ga. 300, 302 [(329 SE2d 149)] (1985) (rule in Georgia of lex fori controls all matters affecting only the remedy). Thus, we turn to Georgia law to discern the appropriateness of the punitive damages award.

*Simon v. Shearson Lehman Bros.*, 895 F2d 1304, 1320 (IV) (11th Cir. 1990). However, the decision cited by the Eleventh Circuit does not directly address whether punitive damages are a matter of substantive or procedural law. See generally *Menendez*, 254 Ga. at 300-302. And, in fact, this Court previously has noted that

> [w]ith respect to punitive damages . . . if the case is one for which such damages may be given in the discretion of the jury under the lex delicti, that law will govern the legal right to demand such damages in another State, unless the lex fori should expressly prohibit punitive damages, or the enforcement of the lex delicti in this respect would contravene an established policy of the forum. This is a substantive right, not a mere matter of remedy.

*Southern R. Co. v. Decker*, 5 Ga. App. 21, 28-29 (62 SE 678) (1908) (citation and punctuation omitted). We therefore disagree with the defendants' assertions that punitive damages are procedural in nature and that the trial court erred in determining that South Carolina rather than Georgia punitive damages law controls these cases.

16

Because punitive damages involve substantive law, we turn to the second part of our analysis: determining whether South Carolina's punitive damages law is radically dissimilar to anything existing in Georgia's system of jurisprudence. *Auld*, 309 Ga. at 896 (2) (b). We find that it is not.

Both South Carolina and Georgia recognize punitive damages as a statutory remedy. See OCGA § 51-12-5.1; S.C. Code Ann. §§ 15-32-520; 15-32-530. South Carolina law differs from Georgia law in two main respects: (1) South Carolina allows punitive damages in a wrongful death action while Georgia does not, and (2) South Carolina allows for the recovery of amounts of punitive damages far greater than those permitted in Georgia without the tortfeasor having acted with a specific intent to cause harm, as Georgia caps such punitive damages at $250,000. Compare OCGA § 51-12-5.1 (e)-(g) and *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 340 (7) (319 SE2d 470) (1984) (holding that Georgia law does not allow the recovery of punitive damages in a wrongful death case), with S.C. Code Ann. §§ 15-32-520; 15-32-530 and *Scott v. Porter*, 530 SE2d 389, 396 (II) (S.C. App. 2000) (affirming an award of punitive damages in a South Carolina wrongful death case). According to the defendants, "[t]here should be no question that these radical dissimilarities will

lead to a *substantive result* contrary to Georgia law and policy," and the trial court's classification of these as "mere difference[s] in law" "defies reason."

However, based on the language in *Auld*, these statutes are not radically dissimilar. For example, in *Auld*, the Supreme Court held that "although wrongful death claims recognized under Belize law provide a somewhat different remedy than wrongful death claims brought under Georgia law and have a shorter limitation period, Belize's wrongful death law is not so radically dissimilar that it cannot be applied by Georgia courts." 309 Ga. at 898 (2) (b). Likewise, *Auld* overruled *Carroll Fulmer Logistics Corp. v. Hines*, 309 Ga. App. 695, 698 (710 SE2d 888) (2011) (in which this Court held that Florida's wrongful death law should not apply because Florida's measure of damages differed from Georgia's), noting that a mere difference in the measure of damages for wrongful death does not make an out-of-state law "so radically dissimilar to anything existing in our own system of jurisprudence that it would seriously contravene the policy embodied in Georgia law." *Auld*, 309 Ga. at 896, 898 (2) (b) (citations and punctuation omitted) (citing "radically dissimilar" language from *Decker*, 5 Ga. App. at 25, in which this Court ruled that although Alabama and Georgia statutory law differed regarding the measure of damages for wrongful death, the relevant Alabama statutory law was enforceable in a Georgia

18

court, id. at 23-24, 34). While the Supreme Court did not specifically define "radically dissimilar" in *Auld*, it is clear that a mere difference in law or the measure of damages does not violate this standard. See 309 Ga. at 896 (2) (b).

In the instant cases, South Carolina law permits the recovery of punitive damages in wrongful death claims when Georgia does not, and South Carolina allows the recovery of a greater amount of punitive damages under certain circumstances. These facts alone do not demonstrate that South Carolina law is "radically dissimilar" from Georgia law. Indeed, this Court in *Decker* addressed a similar situation. There, we concluded that Alabama punitive damages law for wrongful death — although claimed by the appellant to be "dissimilar in character, principle, and design to any and all the laws of [Georgia], especially in that it authorize[d] the assessment of punitive damages for mere negligence, without the proof of any actual damages" — did not constitute a form of redress "radically dissimilar to anything existing in our own system of jurisprudence" and therefore should be applied. *Decker*, 5 Ga. App. at 24-25, 35. Likewise, South Carolina punitive damages law for wrongful death, although it provides a different remedy than Georgia law, does not constitute a form of redress "radically dissimilar to anything existing in our own system of

19

jurisprudence." Id. at 25. The trial court did not err in determining that South Carolina law applies to the plaintiffs' punitive damages claims.

(ii) *Apportionment*. The defendants do not assert that apportionment statutes are procedural, rather than substantive; they merely argue that South Carolina's and Georgia's laws on apportionment are radically dissimilar. We agree with the trial court that they are not. In fact, Georgia's and South Carolina's laws have many similarities: Both states recognize a statutory remedy for apportionment of fault, both states require the jury to apportion comparative fault on a percentage basis to each defendant in the case, and both states allow an assessment of fault to non-parties. See OCGA § 51-12-33; S.C. Code Ann § 15-38-15. In addition, both states have abolished joint and several liability as the default means of apportioning liability. See *McReynolds v. Krebs*, 290 Ga. 850, 850-853 (1) (725 SE2d 584) (2012); *Fay v. Grand Strand Regional Med. Center*, 771 SE2d 639, 648-649 (IV) (S.C. App. 2015).

The defendants, however, claim that South Carolina's and Georgia's laws are radically dissimilar because South Carolina provides an exception to the abolishment of joint and several liability for (i) a defendant whose fault is 50 percent or more of the total combined fault of the plaintiff and defendants, and (ii) a defendant whose conduct was "willful, wanton, reckless, grossly negligent, or intentional or" who

20

engaged in "conduct involving the use, sale, or possession of alcohol or . . . drugs." S.C. Code Ann § 15-38-15 (A), (F). They assert that this exception is critical because the plaintiffs allege that Reynolds was intoxicated at the time of the collisions, though the defendants dispute this fact.

Once again, although these statutes appear to be "somewhat different," and the defendants may be subject to joint and several liability under South Carolina law but not under Georgia law, the statutes are not "radically dissimilar." As the Supreme Court held in *Auld*, "a difference in the measure of damages" does not violate Georgia's public policy. 309 Ga. at 898 (2) (b). The trial court did not err in determining that South Carolina law applies to the apportionment of damages in the plaintiffs' cases.

2. *Spoliation*. The defendants argue that the trial court abused its discretion in issuing a December 21, 2021 order, which was supplemented on December 22, 2021, granting an adverse inference jury instruction for spoliation of evidence. Because the trial court did not apply the proper legal standard given the procedural posture of these cases, we vacate the trial court's December 21 and 22 orders and remand these cases to the trial court for reconsideration of the spoliation issue using the appropriate

legal standard. See generally *Cooper Tire & Rubber Co. v. Koch*, 303 Ga. 336, 343-345 (3) (812 SE2d 256) (2018).

The record shows that immediately following the incident on May 2, 2018, Reynolds called his manager to report the collisions. In fact, TeamOne admits it anticipated litigation as soon as it heard about the collisions, and once Reynolds was released from the scene he met with the TeamOne Director of Safety and Compliance for a brief meeting. In addition, a UPS employee was dispatched to the scene shortly after the incident. He took photos and videos and generally documented what had occurred at the scene. This UPS employee subsequently passed all of his documentation to an attorney.

On May 11, 2018, after the collisions but prior to litigation, the Whitlock family requested that Reynolds's cell phone and all data and records associated with it be preserved and protected. After the lawsuit was filed, the plaintiffs sought the production of Reynolds's phone for inspection and material download. The parties agreed to have an independent third party download the phone data while the plaintiffs' expert witness observed. According to the plaintiffs' attorney, there were perceived issues surrounding turning the phone on and whether any damage might occur to the data in the process. Nevertheless, the defendants' expert witness, William

Jacob Green, completed a download of the phone's data in May 2019 — which the plaintiffs did not learn about until some time later.

In August 2019, when the parties arrived at the mutually agreed upon inspection of the phone to attempt the download, the phone was broken and would not operate, so the plaintiffs' expert, Scott Greene, took the phone to a repair shop. Although Green and Greene both agree that Reynolds was not texting or talking on the phone at the moment of the collision, the plaintiffs raised concerns about information that may have been deleted in the initial May download without anyone knowing. Subsequently, Greene had the phone repaired, successfully conducted a download of the phone's data, and discovered that portions of the data from May 1 and 2, 2018, had been "purposefully" and "selectively" deleted.

Reynolds admits that a string of text messages was deleted from the phone. However, he submitted an affidavit stating that the missing text messages were about transportation logistics and notifying a colleague, Keith Robinson, of the collisions, but contained no specific details about the collisions. In addition, Robinson provided an affidavit confirming Reynolds's assertions about their exchanged text messages.

In October 2019, the plaintiffs filed a motion to strike the defendants' answers or, in the alternative, for other sanctions based on the defendants' failure to preserve

evidence following the collisions and the withholding of documents. Among other things, the plaintiffs argued that Reynolds intentionally deleted text messages from his phone at a time when the defendants were under a duty to preserve all evidence related to the collisions.

In a December 21, 2021 order, the trial court ruled that it would grant an adverse inference jury charge with respect to text messages that Reynolds admitted he deleted from his phone. These text messages were from approximately six hours before and nineteen hours after the collisions. The court specifically found that Reynolds "lost or destroyed relevant evidence that he was under an affirmative duty to preserve" and that the missing text messages "may have revealed a pattern of . . . Reynolds texting while driving in close temporal proximity to the accident itself, which is an important issue in th[ese] case[s]." According to the trial court, the jury instruction will be applicable to all defendants because they "should have known as of the day of the collision that Reynolds'[s] cell phone would need to be inspected in the course of litigation," and they therefore should have acted in good faith to ensure its preservation since Reynolds was an agent of UPS and TeamOne.

The following day, the trial court issued a supplemental order to clarify its initial spoliation order. This order reiterated the court's findings that the corporate

defendants had lawyers and supervisors involved in investigating the collisions shortly after they occurred, Reynolds intentionally deleted text messages in bad faith at a time when the defendants had a duty to preserve the messages, and the text message content was permanently lost and could only be recreated through the oral testimony of an interested party. The trial court rejected the defendants' argument that the texts "were not material" and have limited "practical importance" for reasons stated in its initial order.

(a) *Applicable legal standard*. The defendants assert that the trial court's findings, made without an evidentiary hearing, are inconsistent with the applicable spoliation legal standard. We agree.

"Spoliation refers to the destruction or failure to preserve evidence that is relevant to contemplated or pending litigation. Such conduct may create the rebuttable presumption that the evidence would have been harmful to the spoliator." *Reid v. Waste Indus. USA*, 345 Ga. App. 236, 245 (6) (812 SE2d 582) (2018) (citations and punctuation omitted). "A trial court has wide discretion in adjudicating spoliation issues, and such discretion will not be disturbed absent abuse." *French v. Perez*, 349 Ga. App. 763, 764 (824 SE2d 796) (2019) (physical precedent only) (citation and punctuation omitted). However, it is well settled that the sanction given

in the present cases — a jury instruction allowing for an adverse inference — is one of the most severe sanctions for spoliation and is "typically only reserved for exceptional cases, generally only those in which the party lost or destroyed material evidence intentionally in bad faith and thereby prejudiced the opposing party in an incurable way." *Creek House Seafood & Grill v. Provatas*, 358 Ga. App. 730, 731 (2) (856 SE2d 335) (2021) (citation and punctuation omitted); accord *Koch*, 303 Ga. at 339 (2), 343 (2) (d). "The loss of relevant evidence due to mere negligence — including negligence in determining when the duty to preserve evidence arose — normally should result in lesser sanctions, if any at all." *Koch*, 303 Ga. App. at 343 (2) (d).

The established procedures to address the suspected spoliation of evidence "include a thorough evaluation of the evidence by the trial court." *MARTA v. Tyler*, 360 Ga. App. 710, 712 (1), n. 7 (860 SE2d 224) (2021). Before determining that a jury charge on spoliation is warranted, a trial court "must determine whether spoliation occurred, whether the spoliator acted in bad faith, the importance of the compromised evidence, and so on." Id. at 712 (1) (citation and punctuation omitted). Once the court has determined that spoliation occurred, it should weigh five factors:

(1) whether the party seeking sanctions was prejudiced as a result of the destroyed evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the destroying party acted in good or bad faith; and (5) the potential for abuse if any expert testimony about the destroyed evidence was not excluded.

Id. (citation and punctuation omitted).

As an initial matter, the way in which the plaintiffs raised and the trial court resolved the spoliation claims against the defendants is important to our review of the issue before us. See *Koch*, 303 Ga. at 344 (3). Similar to the situation in *Koch*, the plaintiffs here filed a pretrial motion to strike the defendants' answers or impose other sanctions for spoliation, but did not request an evidentiary hearing on the motion. Id. In addition, "[i]n resolving the motion, the trial court, . . . considered matters outside the pleadings, including witness affidavits and depositions, but did not hold an evidentiary hearing at which the court could decide the credibility of those witnesses." Id.

Thus, under the circumstances presented here, the motion is properly reviewed under the standard applicable to a motion for summary judgment, and as the part[ies] opposing the motion, [the defendants are] entitled to have the evidence in the record viewed in the light most favorable to [them] and to have all reasonable inferences from the evidence drawn in [their] favor.

27

Id. (citations and punctuation omitted). With these principles in mind, we address the defendants' arguments.

(i) *Relevance and materiality*. The defendants argue that the trial court erred in sanctioning them for alleged spoliation of evidence because the text messages sent six hours before and nineteen hours after the accident were not relevant or material to the present cases. With respect to the pre-accident text messages, the trial court concluded that they "may have revealed a pattern of Defendant Reynolds texting while driving in close temporal proximity to the accident itself, which is an important issue in th[ese] case[s]." However, the plaintiffs' own expert admitted that Reynolds was not texting at the time of the accident. In addition, Reynolds and Robinson provided affidavits regarding the substance of these texts, specifically stating that the texts were not relevant or material. Those affidavits must be credited in the current procedural posture, see *Koch*, 303 Ga. at 344 (3), yet the trial court's spoliation orders failed to mention the affidavits even though they contained information that would appear to be critical in relation to the spoliation issue. Given the procedural posture of these cases, the trial court was required to view the record in the light most favorable to the defendants and make inferences in their favor, viewing the circumstances from their perspective at the time the evidence at issue was destroyed.

28

Id. at 344-345 (3). It does not appear that the trial court employed the proper legal standard with respect to the pre-accident text messages.

As for the deleted text messages sent 19 hours after the collision, the trial court found that these texts "may have included commentary on the collision itself." According to the trial court, "[t]he deleted messages may have meant nothing to the case or they may have meant everything. Unfortunately, [the] Defendants' actions have dictated that the jury will never know for sure." Indeed, as the plaintiffs note, the text messages could have shown that Reynolds was fatigued before the wreck, running behind schedule, or distracted, or they could have included an admission of guilt about the collision. Reynolds's affidavit, however, explained the content of these post-accident messages, and, as stated previously, given the procedural posture of these cases, the defendants were "entitled to have the evidence in the record viewed in the light most favorable to [them] and to have all reasonable inferences from the evidence drawn in [their] favor." *Koch*, 303 Ga. at 344 (3). Nevertheless, the trial court never mentioned Reynolds's affidavit in its spoliation orders.

Whether the affidavits of Reynolds and his co-worker were credible and whether the facts as portrayed by Reynolds were true were not issues for the court to

summarily decide without an evidentiary hearing. See *Wheeler v. MARTA*, 302 Ga. App. 877, 878 (691 SE2d 926) (2010).

(ii) *Intent and bad faith*. The defendants argue that although the trial court found that Reynolds "intentionally" deleted the pre-accident and post-accident text messages "in bad faith," these findings were based on disputed evidence that should have been construed in favor of the defendants. Based on *Koch*, 303 Ga. at 344 (3), we agree.

According to Reynolds, he understood he was supposed to preserve all texts, photographs, and data on his cell phone related to the collisions, and he intended to do so. However, he occasionally cleaned out the text inbox on his phone and he may have deleted a text string containing the text messages at issue, though he did not recall specifically doing so. Reynolds's testimony must be credited given the current procedural posture of the cases, see *Koch*, 303 Ga. at 344 (3), and the trial court's spoliation orders do not indicate that the court considered this testimony in the light most favorable to the defendants. In determining bad faith, the trial court should evaluate the credibility of all pertinent witnesses through an evidentiary hearing or review the issue under the standard applicable to a motion for summary judgment. See id. at 344, 347 (3); accord *Harvey*, 311 Ga. at 820 (2) (b) (ii) and n. 9.

30

(iii) *Inability to cure prejudice*. The defendants assert that the trial court also failed to apply the appropriate legal standard regarding this factor. According to the trial court's order, the text message content was permanently lost and could only be cured through the oral testimony of an interested party. However, without an evidentiary hearing, the fact that the affidavits at issue originated from interested parties is irrelevant to the analysis at this stage of the proceeding. As stated previously, given the current procedural posture of these cases, the defendants were "entitled to have the evidence in the record viewed in the light most favorable to [them] and to have all reasonable inferences from the evidence drawn in [their] favor." *Koch*, 303 Ga. at 344 (3). Accordingly, the trial court was required to weigh the affidavits in favor of the defendants, and the trial court's finding in this regard may have been based on an improper legal standard.

In sum, it appears that the trial court failed to (i) consider certain important factors and evidence in analyzing the plaintiffs' spoliation claims, and (ii) properly analyze the spoilation issues using the applicable legal standard based on the procedural posture of these cases. In addition, the procedural posture of these cases has limited the development of the factual record, thus hindering our review of the issues. Because spoliation is a question for the trial court to resolve in the first

31

instance, the spoliation orders must be vacated and the cases must be remanded for further consideration in light of this opinion. See *Reid*, 345 Ga. App. at 247 (6). To decide these issues, "the trial court may conduct an evidentiary hearing or rule on a motion for summary judgment supported by the factual record, in which case all inferences would be drawn in the non-movant's favor." *Harvey*, 311 Ga. at 820 (2) (b) (ii), n. 9; see generally *Reid*, 345 Ga. App. at 247 (6).

(b) *Application to all parties*. The corporate defendants further contend that the adverse inference jury instruction should not be applied to all parties. It is well settled that "[s]anctions for spoliation cannot be applied against a party who did not destroy the evidence when there is no evidence to show that the destroying party was acting at the behest of the other party." *French*, 349 Ga. App. at 764 (2) (citation and punctuation omitted). Because we have vacated the trial court's spoliation orders and remanded the cases for the trial court to consider the spoliation issues using the proper legal standard, and because the procedural posture of the cases has limited the development of the factual record, we decline to address this argument at the present time. We urge the trial court, however, to consider *French*, supra, when ruling on this

issue on remand.

*Judgments affirmed in part, vacated in part, and cases remanded with direction. Doyle, P. J., concurs, and Mercier, J., concurs specially as to Division 1 and in judgment only as to Division 2.*

A22A1231. UNITED PARCEL SERVICE OF AMERICA, INC. et al. v. WHITLOCK et al.

MERCIER, Judge, concurring specially and in judgment only.

Although I believe that the majority, in Division 1 of its opinion regarding choice-of-law issues, reaches the outcome presently required by the existing precedent of *Southern R. Co. v. Decker*, 5 Ga. App. 21 (62 SE 678) (1908), I nonetheless have doubts regarding the completeness of *Decker*'s analysis. For this reason, I write separately and concur specially as to Division 1 of the majority opinion. In addition, I concur in the judgment only as to Division 2 of the majority opinion regarding the issue of spoliation.

With regard to Division 1, when reduced to its simplest form, the pivotal choice-of-law question presented by this case asks whether South Carolina's statutes are radically dissimilar to Georgia's because the former allow the imposition of punitive damages in a wrongful death action and the latter do not. Compare OCGA § 51-12-5.1 (e) - (g) with S.C. Code Ann. §§ 15-32-520, 15-32-530. If there is radical dissimilarity, our courts should apply the Georgia statutes to this case as a matter of

1

public policy, and, if the statutes are not radically dissimilar, the South Carolina statutes should be applied. See *Auld v. Forbes*, 309 Ga. 893, 896 (2) (b) (848 SE2d 876) (2020).

In approaching this analysis, the foundational premise is that punitive damages are considered to be a substantive right and not a matter of procedure or mere remedy. *Decker* points out that,

> [w]ith respect to punitive damages . . . if the case is one for which such damages may be given in the discretion of the jury under the lex delicti, that law will govern the legal right to demand such damages in another State, unless the lex fori should expressly prohibit punitive damages, or the enforcement of the lex delicti in this respect would contravene an established policy of the forum. This is a substantive right, not a mere matter of remedy.

*Decker*, 5 Ga. App. at 28-29 (citation and punctuation omitted).

This treatment of punitive damages makes sense when considering their underlying purpose. Unlike compensatory damages which are designed to compensate an injured plaintiff, "the purpose of punitive damages for a tort is 'to punish' or

2

'penalize' the defendant for the tort committed 'or [to] deter' the defendant from future similar acts." *Carter v. Spells*, 229 Ga. App. 441, 442 (494 SE2d 279) (1997). See also OCGA § 51-12-5.1 (c) ("Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant."). So, punitive damages tie into the State's public-policy concerns that certain tort actions must carry with them the potential of a penalty designed to punish the tortfeasor and deter the commission of similar acts in the future. This, in turn, provides context and support for *Decker*'s statements that the imposition of punitive damages "is a substantive right, not a mere matter of remedy." *Decker*, 5 Ga. App. at 28-29. And, because the concepts of deterrence and punishment are grounded in the public policy of a state, it also follows that, as a general rule, the law under the lex delicti applies "unless the lex fori should expressly prohibit punitive damages, or the enforcement of the lex delicti in this respect would contravene an established policy of the forum." Id.

One would logically intuit from these conclusions that, if one state statutorily imposed the substantive right to punitive damages and one state did not do so for a particular tort, then a radical dissimilarity between the statutes of the two states would

3

arise. But *Decker* strays from this linear logic and appears to conclude that there is no radical dissimilarity in such an instance. *Decker* propounds:

> The view first advanced was that, although the lex delicti made the tortious death actionable, it would be of no avail upon an action brought in another state, even though the death was made actionable by the lex fori also, because such statutes were to be regarded as penal, or at least as having no exterritorial force. As more liberal ideas advanced, the next step taken by the courts was to recognize these statutes as remedial, not penal, and to permit actions to be brought in one state for a tortious death resulting in another state and actionable there, provided there was a statute substantially similar in the state of the forum. But, if there were any very marked dissimilarities between the statutes of the two states, this was still taken to indicate that the enforcement of the lex delicti was contrary to the policy of the forum, and the right to sue there would be denied. The present tendency of the more recent decisions is to advance still further towards liberality, and to throw open the courts to litigants whose cause of action has arisen in other states and under the laws thereof, even though not actionable at common law, or not actionable if

4

it had arisen in the forum, provided the enforcement of the lex delicti

would not seriously contravene the established policy of the forum.

Id. at (2) (punctuation omitted). This discussion relates to the general rule that one

state will not enforce the penal laws of another. *Brady v. State*, 199 Ga. 566, 572 (2)

(34 SE2d 849) (1945) ("It is the general if not the universal rule that one State will

not enforce the penal laws of another State[.]"). However, though an *entire statute*

may not be completely penal in nature simply because it allows the imposition of

punitive damages, that does not mean that the *punitive damages, themselves*, must

lose their separate nature as a penalty and a substantive right mired in public policy.

Nevertheless, *Decker* downplays this underlying nature of punitive damages in its

consideration of the growing liberality of states when applying wrongful death

statutes of other states. Id. In effect, *Decker* appears to throw out the baby with the

bathwater in this respect.

For this reason, I believe that the analysis in *Decker* is truncated and

incomplete. It fails to fully consider the nature and purpose of punitive damages and

their public-policy connection to the specific tort involved. Putting that into practical

terms for the present case, *Decker* largely obviates the consideration of whether South

Carolina's public-policy decision to statutorily punish those who cause the wrongful

5

death of another with the imposition of punitive damages is radically dissimilar to Georgia's public policy not to statutorily do so. This analytical gap causes me to be wary of *Decker*'s conclusions and their continued application. Where two different states impose merely different potential amounts of punitive damages on a certain tort such as wrongful death, one may argue that there is no radical dissimilarity because it is the public policy of both states to punish or deter commission of that tort. But, when one state statutorily imposes punitive damages for wrongful death actions and another state does not *at all*, there is, at the very least, a substantial difference encompassing more than the mere measure of damages. To the contrary, in my opinion, there is a distinct possibility of a radical dissimilarity grounded firmly in conflicting public policy between the two states. Because I do not believe *Decker* adequately considered this possibility, I specially concur in Division 1 of the majority which relies on *Decker*'s analysis.